MOORE, J.
The owners of a mineral servitude, the Worleys, appeal a judgment on the merits that found the servitude prescribed for nonuse and awarded ownership of the minerals to the surface owners, the Magees and the Talleys.[1] Finding no manifest error, we affirm.

Factual Background

In 1958, the Worleys’ ancestor in title sold a 176.6-acre tract in DeSoto Parish to C.B. Magee (“C.B.”), the Magees’ ancestor in title, with a reservation of all minerals. Later, in 1974, Commercial National Bank (“CNB”) became trustee of the Worleys’ mineral interests.
At the time of the sale with reservation of minerals, two wells were producing on the servitude; one of these continued in operation until 1972. After 1959, three other wells were drilled on the servitude, two of which ceased production by 1981. The third, the Worley # 1, was spudded in March 1988 and in production until November 1987, when its operator, Faulconer, abandoned it. In October 1999, an operator drilled the Palmer # 1 well on the servitude, and in March 2010, another operator drilled the Murphy 5H # 1.
The Magees and the Talleys are the current surface owners of the tract. In early 2011 they filed separate suits to declare the servitude prescribed for nonuse. They contended, in a nutshell, that the Worleys failed to use the servitude between November 1987, when Faulconer ^abandoned the Worley # 1, and October 1999, when another operator spudded the Palmer # 1, over 10 years later.
The Worleys countered with three documents: (1) November 15, 1993, “Declaration of Adoption of Operations by Another,” executed by a trust officer at CNB and not signed by C.B., but stating that C.B. “ran a small line from the well to his house” and used the gas for residential purposes since 1989; (2) March 31, 1994, affidavit signed by C.B. to reclassify the Worley # 1 as a well for residential use; and (3) March 1, 1994, letter agreement signed by.C.B., agreeing to pay CNB $5.00 a month “so long as I take said gas from said well for residential purposes.’,’ Each of these documents was drafted by CNB.
All parties moved for summary judgment, which the district court granted in favor of the surface owners. The court relied on Pan Am. Petroleum Corp. v. *26 O’Bier, 201 So.2d 280 (La.App. 2 Cir.), writ ref'd, 251 La. 227, 203 So.2d 558 (1967), .which held that residential production did not interrupt prescription.
This court reversed and remanded, noting that O’Bier predated the enactment of the Louisiana Mineral Code and finding a legal issue in whether C.B.’s residential use of gas from the Worley # 1 was sufficient to interrupt prescription.

Trial Evidence

The matter was tried on the merits in March 2014. The parties stipulated that the issue was whether C.B. (who had died in 2001) “actually and in fact” used any gas from the Worley # 1 well after June 14, 1989, and |swhether that production was in good faith. The surface owners called five witnesses.
Kenneth L. Gaines Jr., an expert in GIS (geographic information systems), surveyed the area in March 2014 and drew two maps. The first map showed the boundaries of the servitude and location of the Worley # 1, of C.B.’s house and dairy, and of the Magees’ house, just up the road. The second showed the results of his survey — a gas service line running from an Atmos/Arkla gas meter to C.B.’s house and a 20-30" — deep trench dug around the house in 2014 in search of a connecting line to the Worley # 1.
Sherman Thomas, the plumber who dug the trench, testified that he found no evidence that any service line had ever run underground from the Worley #1 to C.B.’s house.
Joanne Fulmer Magee, C.B.’s daughter-in-law, .and Mark Magee, C.B.’s grandson, testified that C.B. was in a serious tractor accident in August 1993; as a result, he was in the hospital till the end of that year. After he came home in early 1994, he was still on such intense medication that he was not in his right mind; family members had to take away his checkbook and credit cards.
Joe D. Magee, C.B.’s son, testified that C.B.’s house got gas from Atmos, which had a connection directly in front of the house. He also stated that in 1983, C.B. sold him the 100-acre tract on which the Worley # 1 was located, and he. remembered when Faulconer drilled that well, but it produced so much saltwater that Arkla disconnected it in the fall of 1987. Joe was not aware that Faulconer sold the well to C.B. in June 1989, but | Recalled the only thing C.B. did was to cap it. Until this litigation began, Joe was not aware that C.B. signed the acknowledgment in November 1993 or the agreement in March 1994; he felt that because' of the accident and the intense medication, C.B. could not have known what he was signing. Joe added that the agreement was “wrong” in that it stated C.B. owned the land; in fact, C.B. had sold it to Joe years earlier. Also, Joe conceded that for over a year, his mother sent a monthly $5.00 check to CNB “for the Worley well,” but surmised this was because she and C.B. thought such payment would retain their rights to the well should it ever become productive.
The Worleys called one witness, Louise Pearce, who is now an attorney but, in the 1990s was an administrator in CNB’s trust department. She testified that in the early 1990s, after the Worley # 1 was abandoned, the Worleys were concerned that their servitude might lapse for nonuse, and thought CNB was not protecting their rights. Ms. Pearce had one phone conversation with C.B., in January 1994, in which he agreed to pay CNB $5.00 a month for the privilege of using gas from the Worley # 1, and she got one of the staff attorneys to draft the March 1994 agreement to that effect (erroneously stating that C.B. was the surface owner). On cross-examination, *27 she admitted that CNB never required any proof that C.B. had laid a pipeline from the Worley # 1 to his house or used any gas from it, and that a geologist’s report from October 1094 advised CNB that the minerals in the formation served by the Worley # 1 were depleted.
The Worleys also offered the deposition of John Duco Jr., a retired Department of Conservation inspector. He inspected the Worley # 1 in|sMarch'1994, found the well head to be “in good working order,” and got C.B. to sign the affidavit that he was using gas from it. Mr. Duco recalled C.B. as clear-headed and normal. On cross-examination, he admitted he ran no tests on the head or the line and just accepted C.B.’s word that he was using the gas. He also admitted that the photo he took, attached as “Exhibit Duco 3,” showed no gas line running from the well head.

Action of the District Court

The district court wrote a 9½-page ruling on the merits, thoroughly laying out the facts and holding, that the burden was on the servitude owner to prove that someone had used the servitude in his name. Scott v. Hunt Oil Co., 160 So.2d 433 (La.App. 2 Cir.), writ ref'd, 245 La. 950, 162 So.2d 8 (1964). The court carefully analyzed the documents relied on by the Worleys and found they did not prove actual use. The first, the declaration of adoption of operations, was not signed by C.B.; the second, the affidavit, stated only that the well “will be used” for residential consumption, not that it ever actually was. The court parsed Mr. Duco’s deposition, noting that this 91-year-old witness’s recollection of seeing a pipeline from the Worley # 1 to C.B.’s house was refuted by the contemporaneous photo of the well head, which showed no connection to the well. The third document, the letter agreement, was drafted by CNB’s attorneys “with the exclusive hope of interrupting prescription” and established nothing more than C.B.’s right to use the gas. The court implicitly accepted the family members’ testimony that in early 1994, C.B. was heavily medicated, “frequently disoriented and had poor memory,” thus casting doubt on the accuracy of the letter | ^agreement. The court found that C.B. may have been confused, as he was in fact receiving gas from a different well (the Shirley Williams well). Finally, the court accepted the geologist’s report that by 1994, .the gas in this formation had been depleted.
The court concluded that nothing interrupted prescription of nonuse, and the Worleys’ servitude prescribed in November 1997. Finally, the court rejected the claim of equitable estoppel, as there was no proof the Worleys' changed their position as a result of C.B.’s representations. The court rendered judgment declaring the servitude terminated “on or before November 1, 1987, as a result of the accrual of prescription for nonuse.”
The Worleys have appealed, raising three assignments of error.

Discussion: Factual Finding of Nonuse

By their first assignment of error, the Worleys urge the court committed manifest error in finding that C.B. did not use the minerals from the servitude. The Worleys concede the standard of review is manifest error, but reiterate the facts which in their view prove C.B. was indeed running a gas pipeline from the Worley # 1 to his house: Ms. Pearce’s testimony; the declaration, affidavit and letter agreement, described above; Mr. Duco’s report; and the checks that C.B.’s wife wrote to CNB for 17 months. They characterize this as a “plethora of evidence,” and contend that the surface owners offered only “scant evidence” to prove C.B. did not use gas from the Worley # 1. They criticize Gaines’s maps and Thomas’s testimony, arguing that this evidence proved only that *28 no pipeline was present in 2014, when they surveyed and mapped; in the Worleys’ view, this 17cannot overcome C.B.’s written admissions and statements to Ms. Pearce, and Mr. Duco’s recollections, that such a line existed in 1994. They conclude the court’s finding is plainly wrong.
A mineral servitude is extinguished by prescription resulting from nonuse for 10 years. La. R.S. 31:27(1). The prescription of nonuse running against a mineral servitude is interrupted by good faith operations for the discovery and production of minerals. La. R.S. 31:29. When prescription of nonuse is interrupted by production, the prescription begins to run anew from the date of cessation of actual production. La. R.S. 31:36. The district court correctly identified the issue as whether C.B. actually used any gas from the servitude between October 31, 1987, when the Worley # 1 was shut in, and October 26, 1999, when a different operator spudded the Palmer # 1.
A trial court’s findings of fact on the issue of prescription are subject to the manifest error-clearly wrong standard. Marin v. Exxon Mobil Corp., 2009-2368 (La.10/19/10), 48 So.3d 234, 177 Oil & Gas Rep. 453. Under this standard, if there are two permissible views of the evidence, the fact finder’s choice between them cannot be manifestly erroneous or clearly wrong. Peironnet v. Matador Resources Co., 2012-2292 (La.6/28/13), 144 So.3d 791, citing Rosell v. ESCO, 549 So.2d 840 (La.1989). Where documents or objective evidence so contradict a witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit it, then the appellate court may well find manifest error. Id. But if such factors are not present, and a fact |sfinder’s finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Id.
We have closely examined this record and find some evidence that C.B. used gas from the Worley # 1 but the preponderance of the evidence supports the finding that he did not. Joe Magee explicitly recalled that the Worley # 1 was drilled in 1978 and that there was never a line carrying gas from it to C.B.’s house; the surveyor, Gaines, confirmed where such a line would have to have run, and the plumber, Thomas, could find no evidence that any such line ever existed. The Worleys speculate that C.B. might have installed an above-ground line, but this seems improbable and does not refute Joe’s testimony and the circumstantial evidence of the survey and excavation. Moreover, all witnesses agreed that C.B.’s house did in fact receive gas from a different source, the Arkla/Atmos gas meter, a fact that may have confused C.B. when he signéd the letter agreement. The court may also have considered that the monthly $5.00 check was inconsistent with any actual gas use.
The Worleys also argue that the surface owners offered only testimony, and no medical records, to show that C.B. was mentally impaired in early 1994, but the only evidence they offered to the contrary was the deposition of Mr. Duco, whose “clear” recollection of seeing a pipeline is impeached by the contemporaneous photo showing no such thing.
The district court meticulously analyzed the three documents relied on by the Wor-leys — the declaration, affidavit and letter agreement — and |9found they did not contradict the testimony and circumstantial evidence. The court was not plainly wrong to discredit the first, which was not signed by C.B., the second, which was written by CNB and contained a factual misstatement about ownership, and the *29 third, which established only C.B.’s right to use the gas. Notably, CNB’s trust officer, Ms. Pearce, conceded that she directed CNB’s legal department to draft all these documents in an effort to preserve the servitude, and that she never verified that C.B. was actually using the gas. These are not the kind of documents or objective evidence that contradict the witnesses’ account and create manifest error.
This assignment of error lacks merit.

The Remaining Arguments

By their second assignment, the Wor-leys urge the court erred in finding there was no use of the mineral servitude sufficient to interrupt prescription. They contend that under La. R.S. 31:38, “it is not necessary that minerals be produced in paying quantities” to interrupt prescription, only that they be actually produced “in good faith with the intent of saving or otherwise using them for some beneficial purpose.” They argue that residential use is a beneficial purpose and that Pan Am. Petroleum Corp. v. O’Bier, supra, was legislatively overruled by the enactment of the Mineral Code. Finally, they contend that they adopted the operations of the surface owners’ predecessor, such operations were in good faith, and this actual production (not mere operation) served to interrupt prescription, under R.S. 31:39.
ImThe argument stands on the premise that C.B. used the servitude to take some quantity of gas from the Worley # 1 for his household purposes; however, the court found that no such use occurred. This court has affirmed that finding, and the argument therefore falls. This assignment lacks merit.
By their final assignment of error, the Worleys urge the district court erred in refusing to apply equitable estop-pel to the plaintiffs’ prescription claims. They cite the elements of estoppel: representation by conduct or work, justifiable reliance thereon, and change of position to one’s detriment because of that reliance. Wilkinson v. Wilkinson, 323 So.2d 120 (La.1975). They argue that they changed their position to their detriment by taking no action to produce minerals from the servitude, thus activating estoppel.
 Estoppel is not favored in Louisiana law. Luther v. IOM Co. LLC, 2013-0353 (La.10/15/13), 130 So.3d 817; First La. Bank v. Morris & Dickson Co., 45,668 (La.App. 2 Cir. 11/3/10), 55 So.3d 815. The party invoking estoppel bears the burden of proving the facts on which it is founded. Commercial Nat’l Bank v. Rowe, 27,800 (La.App. 2 Cir. 1/24/96), 666 So.2d 1312. We agree that the Worleys relied on the ambiguous (and in one case, erroneous) documents drafted by CNB to protect their mineral servitude. However, the record does not show that the Worleys chose to give up or forgo any plans or opportunities to lease the lands and formations covered by the servitude, rework or restore commercial production from the Worley # 1, or drill any new wells. In fact, the original operator, Faulconer, had abandoned the well, and CNB’s geologist reported “nothing to recommend the Wor-ley Servitude for further exploration and ^development.” In short, the district court was not plainly wrong to find no proof of an actual change in the Worleys’ position. This assignment lacks merit.

Conclusion

For the reasons expressed, the judgment is affirmed. Costs are to be paid by the Worleys.
AFFIRMED.

. In full, the servitude owners are Wyeth Har-dey Worley, Martha Jane Worley Jackson, Judith Eleanor Wolf and Penuel Haynes Worley. The surface owners of one part of the tract are Joe D. Magee and Joanne Fulmer Magee; of the other part, Howard Charles Talley, Shirley Kay Kauffman Talley, Jeffrey Charles Talley, Amy Deville Adams Talley, Bobby W. Adams and Anne E. Adams.