GARRETT, J.
hBilly Joe (“B.J.”) and Betty Ruth Andrews appeal from a trial court judgment finding that two mineral servitudes, affecting property to which they own the surface rights, have not prescribed from nonuse and are still in effect. For the following reasons, we affirm the trial court judgment.
BACKGROUND INFORMATION
The Andrewses own several tracts of land in Sections 32 and 33, Township 13 North, Range 14 West, in DeSoto Parish. Part of the land is burdened with a mineral servitude held by Union Central Life Insurance Company (“Union Central”), which later merged with Ameritas Life Insurance Corporation (“Ameritas”).[1] Another mineral servitude, covering some of the same property, is held by Daniel Joseph Smith, Patricia Marie Smith Maloy, and Margaret Linn Smith, widow of Dewitt Rogers Smith (“Smith heirs”). The Smith heirs inherited the servitude from Sara R. Smith.
In 1966, Union Central and Sara Smith executed oil, gas, and mineral leases on the servitudes to Mallard Drilling Corporation (“Mallard”). Four producing wells were drilled. Several storage tanks and two “gun barrels,” tanks used to separate water from oil, were placed on the property. Over time, all but one well stopped producing. Only two storage tanks and one gun barrel remained in use. This case concerns the last producing well, Rogers No. 1 Well, which was drilled in 1966.
In 1990, Mallard assigned its leases to David Ogwyn d/b/a Quest Energies, LLC, and Quest was named the operator of the wells. In 1994, the Smith heirs and Ameri-tas executed oil, gas, and mineral leases to Ogwyn |2d/b/a Quest. In November 2001, the operator of the wells was changed from Ogwyn and Quest to Terry Dale Jordan, a former Quest employee. Effective November 1, 2001, Ogwyn and Quest assigned the leases to Jordan.
At some point in the 1990s, Mr. Andrews complained that Quest damaged a road on his property. Quest entered into a verbal agreement with Mr. Andrews to serve as “pumper” on the well. He checked on the well and, at some points, kept records of the amount of oil in the storage tanks. The terms of the agreement were that Mr. Andrews would share in the net profits from the well, along with Ogwyn and Cecil Sepulvado, Ogwyn’s business associate. No controversies arose between the Andrewses and the servitude owners until the Haynesville Shale leasing bonanza began in DeSoto Parish. As will be explained below, the Andrewses claimed to be the owners of all the mineral rights on their property. To the contrary, the servitude owners maintained their rights were still in effect.
Mr. Andrews claimed that, in May 1997, he witnessed the Rogers No. 1 Well have mechanical difficulties and stop pumping. However, the documentary evidence presented at trial showed that the well continued to use electricity through September 1998, and on May 27, 1999, approximately 350 barrels of oil from the storage tanks were sold. Ameritas and the Smith heirs received royalty payments from the sale. The servitude owners presented evidence that this oil was the result of production from Rogers No. 1 Well after 1997. Further, Jordan testified that in 2001 or 2002, he was able to “bottom bump” the well and get it pumping oil again, although the well did not operate for very long.
In 2007, the Smith heirs and Ameritas each executed new mineral leases with *873 Beusa Energy, Inc. (“Beusa”). The An-drewses also leased to |sBeusa acreage that was not covered by the two mineral servitudes. Mr. Andrews then began a course of action to secure the mineral rights over all of his property. Interestingly, in 2008, during the Haynesville Shale boom, at the insistence of Mr. Andrews, records with the Louisiana Office of Conservation were altered to show that no production occurred from Rogers No. 1 Well after 1997. Mr. Andrews represented to the Office of Conservation and Ogwyn that he knew what happened to the well and when, that he had records proving that production on the well stopped in 1997, and that the servitude owners were aware of it. These statements were later shown to be untrue.
On May 16, 2008, when Beusa was contemplating drilling new gas wells in the area, Mr. Andrews sent a letter to Beusa’s leasing agent, Albert S. Ruffin, Jr., stating the following:
If you can hold off production until June 2009, (NOTE: PRODUCTION REPORTS SHOWS [sic] LAST OIL SHIPPED FROM STORAGE TANKS MAY 1999) we will not need legal help; all mineral rights would return to rightful owners B.J. AND BETTY AN-DREWSU
It is my understanding that any production on Section 82 or 38 prior to June 1, 2009 will hold mineral rights for others should we not win our Legal Rights. If we have to go to court for any reason we will block the use of subject properties until court decision is made on who is the rightful mineral owners [sic].
If we can hold off production until June 1, 2009 future negotiations for the use of approx. 160 acres for well sites, pipelines, access roads and water will be available for sections 32 & 33.
Ruffin testified that Andrews also tried to get him to sign a document that Beusa would accept the change in the Office of Conservation records regarding production. Ruffin refused to do so.
|4In 2008, through his attorney, Mr. Andrews sent letters to the Smith heirs and Ameritas, demanding that they acknowledge that their servitudes had prescribed and the mineral rights actually belonged to him and Mrs. Andrews. The servitude owners made inquiries and discovered that the Office of Conservation records had been changed without their knowledge. They declined to execute the releases demanded by the Andrewses.
The Smith heirs originally filed this suit on July 9, 2009, against the Andrewses, Quest, Ogwyn, and Jordan. They essentially claimed that the defendants were attempting to usurp their rights to their mineral servitude.
The Andrewses answered and asserted a reconventional demand against the Smith heirs, Ameritas, and Beusa. They claimed that the Rogers No. 1 Well ceased production in May 1997, and the mineral servi-tudes of the Smith heirs and Ameritas had prescribed. The Andrewses claimed to be the owners of the mineral rights and demanded damages for the refusal of the Smith heirs and Ameritas to file notice in the public records acknowledging the expiration of the servitudes. They also asserted that the servitude owners’ leases to Beusa were invalid. This claim was later resolved between the Andrewses and Beusa.[2]
*874 Union Central, now Ameritas, filed cross-claims against Quest, Ogwyn, and Jordan. After extensive discovery, the various parties filed motions for summary judgment, which were denied. More motions followed on some narrower issues. In January 2015, the trial court granted a partial summary judgment in favor of the Andrewses and denied cross-motions by the Smith heirs and Ameritas. These motions focused on the Inactivities of Jordan in 2001-2002. The trial court ruled that Jordan’s activities were insufficient to interrupt prescription. Ameritas and the Smith heirs applied for writs to this court. On May 7, 2015, this court granted the writ application and reversed the trial court judgment. We found that there were genuine issues of material fact as to whether the servitudes had prescribed, particularly with regard to the actions and intentions of Jordan.
The case was finally tried as a bench trial over four days in December 2015. Prior to trial, the parties filed a 73-page “Pretrial Order” which contained the parties’ positions, stipulations, and areas of dispute. Extensive pretrial briefs were also filed. As will be discussed more fully below, the trial court ultimately found Mr. Andrews to be completely lacking in credibility and ruled in favor of the servitude owners.
At trial and in depositions, Mr. Andrews gave several inconsistent versions of what he contended happened to Rogers No. 1 Well. Mr. Andrews had given a deposition saying that the well depleted and then he guessed that it broke, but he could not give a reason why. In another deposition, he changed this story to say that something broke down the hole. He claimed he said this on the advice of someone with Beusa. At trial, Mr. Andrews testified that the well stopped pumping in 1997, and never pumped again. He said he was on site when the well stopped working. He claimed that a rod was broken. Later at trial, he stated for the first time that he was watching his cattle at the site and heard a loud sound when the pump broke.
Mr. Andrews was asked about evidence reflecting production after 1997, and he replied that he “ignored it.” He also said the well never used any electricity after 1997, even though utility company records showed differently. Utility records obtained by the servitude owners showed electric Lusage until September 1998, and then again in November 2001 through January 14, 2002.
Mr. Andrews had some tickets from Eott, the company that purchased oil from Quest and sent trucks to the site to pick it up. However, he could not account for all the tickets. Mr. Andrews speculated that the oil sold after 1997 was the result of someone bringing oil to the site from another location. However, he had no proof to support this. Several witnesses also testified that to do so would be a crime.
Ogwyn testified at trial that no oil was brought from another site and the sale of oil in May 1999, which resulted in royalty payments to the Smith heirs and Ameritas, could not have been made without production from the well. He stated that he corrected some records with the Office of Conservation due to a clerical error. Later, Mr. Andrews contacted him, stating that the well had not produced after 1997, and that he had written records to prove it. He wanted Ogwyn to initiate a change in the Office of Conservation records to reflect no production after that date. Mr. Andrews also represented that the mineral servitude owners were in agreement with the change. Ogwyn complied with the request. As information was developed and brought to light, it became apparent that the information conveyed to Ogwyn by Mr. Andrews was untrue.
*875 The evidence adduced at trial shows that Mr. Andrews never contacted the Smith heirs or Ameritas until after the Office of Conservation records were changed. At one point in the trial, Mr. Andrews denied trying to get the records changed. At another point, he did not deny that he represented to the Office of Conservation that everyone agreed that the records needed to be changed.
17Becky Henry, the manager of the production audits section of the Office of Conservation, testified by deposition. In May 2008, she got a call from the Andrewses who claimed that the production records for Rogers No. 1 Well were not correct. They were told that the operator would have to request that the records be corrected. She stated that the Andrewses called several times. Mr. Andrews was adamant that there was no production from the well after 1997.
Henry was later contacted by Ogwyn regarding how to correct the records. He was told that he needed to file correction reports. The Office of Conservation sent correction reports to Jordan, which he signed and returned. After the correction reports were received, the Office of Conservation changed its official records regarding production from the well to show that no production occurred after 1997.
Other evidence adduced during the trial will be discussed below. On March 15, 2016, the trial court issued “Reasons for Judgment,” which will also be discussed below. On June 25, 2016, the trial court signed a judgment in favor of the Smith heirs and Ameritas. The court found that the mineral servitudes were maintained by production of minerals and/or good faith operations for discovery and production of minerals. All claims asserted by Ameritas against Quest, Ogwyn, and Jordan were dismissed with prejudice. All claims asserted by the Andrewses were dismissed with prejudice. The judgment was certified as final for purposes of appeal.
On appeal, the Andrewses present numerous assignments of error. At the outset, they argue that the trial court erred by adopting, as reasons for judgment, the “argumentative” post-trial briefs of opposing counsel and not making its own independent findings. They ask us to reverse and remand |sfor a new trial. They also contend that the trial court erred by placing the burden of proof on them, when it should have been placed on those asserting the existence of mineral servitudes. They maintain that the evidence proves prescription was not interrupted and that the servitudes had prescribed. They claim that the evidence does not support an interruption of prescription by production between 1997 and 1999, or through the activities of Jordan in 2001 or 2002. They contest the applicable dates for unitization and unit activity.
ADOPTION OF COUNSELS’ BRIEFS AS REASONS FOR JUDGMENT
According to the Andrewses, the trial court committed legal error by adopting, as reasons for judgment, the “argumentative” post-trial briefs of opposing counsel. They claim the trial court made no independent findings of fact or law, beyond a blanket rejection of Mr. Andrews’ testimony. They maintain that the trial court failed to weigh the evidence presented at trial, and urge us to reverse and remand for a new trial and/or review the entire record de novo, rather than applying the manifest error standard of review. This argument is without merit.
In United States v. El Paso Nat. Gas Co., 376 U.S. 651, 84. S.Ct. 1044, 12 L.Ed.2d 12 (1964), the United States Supreme Court considered a case where the federal trial court announced from the bench that the judgment would be granted *876 for one party and instructed their counsel to prepare findings of fact, a conclusion, and a judgment, which were adopted by the trial court. The Supreme Court stated:
Those findings, though not the product of the workings of the district judge’s mind, are formally his; they are not to be rejected out-of-hand, and they will stand if supported by evidence.
| gIn Shoreline Gas, Inc. v. Grace Res., Inc., 34,517 (La.App. 2 Cir. 4/4/01), 786 So.2d 137, this court considered the argument that the trial court abrogated its role as factfinder by calling for the submission of findings of fact and conclusions of law from all parties and then adopting those submitted by Shoreline. We found that, where the trial court adopted one party’s findings of fact, after stating that it had made a “careful consideration of all the evidence and arguments of counsel,” it did not abdicate its factfinding duty. Further, the findings were substantiated by the record evidence.
If the findings are not supported by the record, they are rejected. In some situations, manifest error is committed when the trial court assigns, as reasons for judgment, the argumentative brief of counsel, making it obvious it has not adequately weighed the evidence before it. See Cashio v. Holt, 425 So.2d 820 (La. App. 5th Cir. 1982), unit denied, 430 So.2d 94 (La. 1983); Benoit v. Frank’s Casing Crew, 97-1522 (La.App. 3 Cir. 5/20/98), 713 So.2d 762, writ denied, 1998-1697 (La. 10/9/98), 726 So.2d 31; Safeco Ins. Co. v. Farm Bureau Ins. Cos., 490 So.2d 565 (La. App. 3d Cir. 1986); I.F. v. Administrators of Tulane Educ. Fund, 2013-0696 (La. App. 4th Cir. 12/23/13), 131 So.3d 491. The jurisprudence provides that, where such findings are supported by the evidence, they will not be rejected. See Bell v. Ayio, 97-0534 (La. App. 1 Cir. 11/13/98), 731 So.2d 893; unit denied, 1998-3115 (La. 2/5/99), 738 So.2d 7; Lancaster v. Petroleum Corp. of Delaware, 491 So.2d 768 (La. App. 3d Cir. 1986); Bayou Fleet, Inc. v. Bollinger Shipyards, Inc., 2015-0487 (La. App. 4th Cir. 7/21/16), 197 So.3d 797.
|1ftAs set forth above, the parties in this case filed comprehensive pre-trial briefs, in addition to the lengthy pretrial order. At the conclusion of the four-day trial, counsel for the Andrewses requested permission for the parties to file post-trial briefs. The parties jointly filed a 39-page list of “Correlated Trial” exhibits after the trial. The parties obviously obtained a transcript of the trial testimony as the post-trial briefs contained extensive quotes from the testimony, citations to page numbers, and citations to exhibits. Against this backdrop, the trial court issued its reasons for judgment on March 15, 2016.
In written reasons for judgment, the trial court specifically found that all the testimony offered by Mr. Andrews was not credible and was discounted in its entirety. The trial court rejected all claims by the Andrewses and found in favor of the Smith heirs and Ameritas, rejecting all claims against them, as well as Ogwyn, Quest and Jordan. The trial court stated:
The court has thoroughly reviewed the record of these proceedings and the evidence adduced together with the applicable law and jurisprudence in light of the well-reasoned briefs filed by counsel for their respective clients.
The trial court further stated:
The beginning is the never easy or desirable job of openly evaluating the credibility of the main witness in the case. Here, more than any civil case ever before this court, it is essential that this evaluation must be objectively and subjectively made at the outset with regard to the testimony of B.J. Andrews, in order for the findings of the Court to be placed in proper perspective.
*877 The court said that, in making its evaluation of credibility, it charged itself with the same charge used in civil jury trials:
If you believe that any witness in the case, either for the Plaintiff or Defendant, has willfully and deliberately testified |nfalsely to any material fact, for the purpose of deceiving you, then I charge you that you are justified in disregarding the entire testimony of such witness as proving nothing, and as unworthy of belief. You have the right to accept as true, or reject as false, the testimony of any witness, in whole or in part, accordingly, as you are impressed with his or her truthfulness.
The trial court then stated:
Considering this charge, the Court finds that because of his numerous inconsistent statements, his overt actions in fraudulently changing public records to his benefit, body language in Open Court together with his admitted perjury via deposition, none of the testimony of B.J. Andrews can be considered. To attempt to pick and choose what, if any portion(s) of his testimony are credible is impossible.... It is the Court’s opinion the only logical and legal solution is to discount his entire testimony as proving nothing and unworthy of belief.
The court also said:
Accordingly, for the reasons cited in brief by counsel for Smith Heirs, Ameri-tas and Ogwyn, which the Court adopt[s] in full as its reasons for judgment, there is judgment in their favor and against B.J. Andrews.
The reasons for judgment show that the court did consider the law and evidence and made independent factual findings upon which the decision was based. The trial transcript also shows that the trial judge carefully considered the testimony as it was being given during trial and, at numerous points, questioned many witnesses himself. The trial court was obviously quite familiar with this case, which was before it for more than six years before it was finally tried. The testimony of Mr. Andrews was the sole basis for his claim that the Rogers No. 1 Well stopped producing in May 1997, and that the prescription of nonuse began to run at that point. The trial court’s reasons for judgment clearly show that it weighed the evidence before it and determined that the testimony of Mr. Andrews was not 112credible.[3] Although not explicitly stated, the trial court implicitly determined the substantial amount of countervailing documentary evidence and testimony presented by the servitude owners to be credible and trustworthy. Under all of these circumstances, we find that the trial court did not abdicate its duty as factfinder. Further, as will be discussed below, the judgment rendered by the trial court is amply supported by the voluminous record.
BURDEN OF PROOF
The Andrewses next assert that the trial court erred in placing the burden of proof on them. They claim that, in its post-trial brief, Ameritas argued that, because the Andrewses filed a reconventional demand against it claiming the rights to the minerals on the land, the Andrewses carried the burden of proving that the mineral servitudes had prescribed. They assert that this was an error of law that supports a de novo review of the record. We find no reversible error on this issue.
*878 A mineral servitude is the right of enjoyment of land belonging to another for the purpose of exploring for and producing minerals and reducing them to possession and ownership. La. R.S. 31:21. Among the modes of extinction of mineral servitudes is prescription from nonuse for 10 years. See La. R.S. 31:27. Prescription of nonuse of a mineral servitude commences from the date on which it is created. La. R.S, 31:28. The law provides several methods by which prescription may be interrupted. A trial court’s findings of fact on the issue of prescription are subject to the | ^manifest error-clearly wrong standard. Magee v. Worley, 49,653 (La.App. 2 Cir. 3/4/15), 163 So.3d 23.
When the prescription of nonuse is pleaded, the owner of the dominant estate has the burden of proving that he or some other person has made use of the servitude as appertaining to his estate during the period of time required for the accrual of the prescription. La. C.C. art. 764. See also Scott v. Hunt Oil Co., 160 So.2d 433 (La. App. 2d Cir. 1964), writ refused, 245 La. 950, 162 So.2d 8 (1964). This burden of proof has been applied even when a surface owner sues to obtain the cancellation of a mineral servitude. See Kellogg Bros., Inc. v. Singer Mfg. Co., 131 So.2d 578 (La. App. 2d Cir. 1961); Magee v. Worley, supra.
In this matter, the Smith heirs initiated this suit to prevent the Andrewses and others from interfering with their rights under the mineral servitude. They clearly had the burden of proving that their servitude had not prescribed. The Andrewses filed a reconventional demand against the Smith heirs and also named Ameritas as a defendant in reconvention. The Andrewses asked the court to rule that the servitudes were extinguished due to the running of prescription of nonuse and that the An-drewses were the sole owners of all mineral rights on the property. As a servitude owner, Ameritas had the duty to show that the mineral servitude had not prescribed.
As will be explained below, we find that the evidence in this record shows that the Smith heirs and Ameritas presented overwhelming evidence to carry their burden of proving that the mineral servitudes had not prescribed and that the Andrews-es were not entitled to the relief they sought. We note that, during the trial, the Smith heirs presented their evidence first, which is an indication that the litigants recognized that they bore the burden | uof proof to establish their case. The interests of the Smith heirs and Ameritas were obviously aligned during the trial. Any possible error that may have occurred in the allocation of the burden of proof is not reversible under the circumstances of this case. Where the review of a record clearly indicates that the judgment of the lower court is correct and that justice has been done, that judgment will not be overturned because of an error which did not affect the merits. See Shows v. Williamson, 256 So.2d 688 (La. App. 2d Cir. 1972), writs refused, 261 La. 231, 259 So.2d 76 (1972), and 261 La. 456, 259 So.2d 912 (1972); Ford Motor Credit Co. v. Partee, 514 So.2d 640 (La. App. 2d Cir. 1987).
PRESCRIPTION OF THE MINERAL SERVITUDES
The Andrewses next argue that, even if the testimony of Mr. Andrews is completely disregarded, there is sufficient evidence in the record to show that the minex-al servitudes prescribed through nonuse. They insist that the servitude owners failed to prove an interruption of prescription by production between 1997 and 1999, or by the activity of Jordan in 2001 through 2002. They also claim that incorrect dates were utilized for unitization and unit activity that marked the next event *879 that could have potentially interrupted prescription, if the servitude had not yet prescribed. These arguments are without merit.
Production Prom 1997 Through 1999
The record does not support the Andrewses’ argument basically alleging that there was no production from the servitude after 1997. The only evidence that the Rogers No. 1 Well ceased producing in May 1997 was the testimony of Mr. Andrews, which was found not to be credible. The servitude owners presented ample evidence to show that the servitudes had | iSnot prescribed. Because the litigation was not instituted until 2009, the servitude owners were tasked with reconstructing events that occurred in the past. They presented documentary evidence, expert and lay testimony, and were successful in their task.
The record shows that the well continued to use electricity through the billing cycle ending September 29, 1998, and electricity was only used to power the pump on the Rogers No. 1 Well. Without electricity to operate the pump, the well could not produce.
According to the record, on October 31, 1997, 69 barrels of oil were sold from one of the storage tanks connected to the well. On May 27, 1999, 178.79 barrels were sold from storage tank number 6 (also known as 1410) and 174.19 barrels were sold from storage tank number 5 (also known as 1409). Testimony showed that the tanks did not contain that much oil in October 1997. The testimony of Ogwyn established that no oil was brought from any other site and placed in the tanks. This was corroborated by the testimony of Harold Durr, an employee of Quest, who worked on the wells on the servitudes over the years and stated that they never transported oil from one lease to another.
The servitude owners also offered the testimony of Robert McGinnis, an expert in petroleum engineering, who stated that, based on past sales and amounts in the holding tanks, production had to occur in order to get the volumes that were measured in the tanks in May 1999, and which resulted in the sale of oil, leading to issuance of royalty checks for the Smith heirs and Ameritas.
ImThis evidence is sufficient to show that the well produced through September 1998, resulting in interruption of prescription in the mineral servitude through that date.
Actions of Terry Dale Jordan
The Andrewses next argue that the trial court erred in finding that the activities of Jordan operated to interrupt the running of prescription. They contend that his actions were not carried out on behalf of the servitude owners because there was no legal relationship between them; Jordan did not have the intent to benefit the servitude owners; there was insufficient evidence that Jordan achieved production in sufficient quantities to interrupt production; and the activities carried out by Jordan were not sufficient to constitute good faith operations. They also contend that Jordan’s testimony was not credible. These arguments are without merit.

Legal Relationship or Intent to Act for Servitude Owner

According to the Andrewses, Jordan’s actions were not sufficient to interrupt prescription on the servitude because he had no legal relationship with the servitude owners and he did not have the intent to benefit them. These arguments are without merit.
La. R.S. 31:42 states:
Except as provided in Articles 44 through 52, use of a mineral servitude must be by the owner of the servitude, *880 his representative or employee, or some other person acting on his behalf.
La. R.S. 31:43 provides:
A person is acting on behalf of the servitude owner only when there is a legal relationship between him and the servitude owner, such as co-ownership or agency, or when there is clear and convincing evidence that he intended to act for the servitude owner. Silence or inaction by the servitude owner will |17not suffice to establish that a person is acting on behalf of the servitude owner.
“Clear and convincing evidence” is an intermediate standard of persuasion. It requires more than a preponderance of the evidence, but less than proof beyond a reasonable doubt. The existence of the disputed fact must be highly probable, that is, much more probable than its nonexistence. Brannon v. Shelter Mut. Ins. Co., 507 So.2d 194 (La. 1987); Cash v. McGregor, 31,537 (La.App. 2 Cir. 2/24/99), 730 So.2d 497, writ denied, 1999-1117 (La. 6/4/99), 744 So.2d 628.
In attacking the acts done by Jordan as insufficient to interrupt prescription on the mineral servitudes, the Andrewses first assert that, as required by La. R.S. 31:43, Jordan had no legal relationship with the servitude owners, such as co-ownership or agency. The record shows that the Smith heirs and Ameritas had a lease with Quest, and Ogwyn/Quest was the operator of the well. That lease contained a 90-day continuous operations clause whereby the lease would be cancelled if operations stopped for 90 days. The testimony of Ogwyn and Jordan shows that, when Ogwyn and Quest purported to assign the lease to Jordan, the lease had lapsed under this clause. Therefore, Jordan did not have a valid lease with the servitude owners.
However, La. R.S. 31:43 provides that a person may also act on behalf of the servitude owner to interrupt prescription when there is clear and convincing evidence that he intended to act for the servitude owner. Based upon this record, we find that such a showing was made.
Jordan testified that he was 66 years old and had 53 years’ experience working in the oilfield. He had worked as a pumper for 38 years. He had |,«worked for Ogwyn and Quest and made a deal with Ogwyn to take over some wells in an effort to get them pumping again. That agreement included the Rogers No. 1 Well. Jordan was familiar with the well because he had served as the pumper in the early 1990s.
On November 1, 2001, Jordan made an application to the Office of Conservation to amend the drilling permit to name himself as the operator of the well instead of Og-wyn/Quest. Also, effective November 1, 2001, Ogwyn and Quest assigned its leases with the Smith heirs and Ameritas to Jordan. Jordan testified that he understood that the wells were subject to a lease and that any production obtained would benefit the royalty owners, the Smith heirs and Union Central (now Ameritas). Jordan also acknowledged that the leases had a 90-day continuous operation clause, and that the leases had lapsed due to the passage of more than 90 days with no production. He stated that the standard practice is, if production is restored, to get a ratification of the lease from the servitude owners. He did not do that in this case because the well did not produce for long enough and prices had dropped.
Jordan testified that he believed the assignment from Ogwyn gave him the right to produce the Rogers No. 1 Well and that he was acting for his own benefit and for anyone else who owned an interest in the lease. The assignment clearly referenced the two leases that had been executed by the servitude owners. All of this evidence is sufficient to show that Jordan was aware *881 that both the Smith heirs and Ameritas had rights to any production that might be obtained from the well and that he was acting to make money for himself and the mineral owners.
liBThe Andrewses argue that Jordan could not have been acting for the “royalty owners” because the lease had expired before he began his attempts to re-establish production. They attempt to confuse royalty owners with servitude owners. Jordan’s testimony was clear that any actions he took were done with the intent to act not only for himself, but also for the servitude owners. There is no evidence in the record to rebut this testimony. Based upon this record, the Smith heirs and Ameritas showed by clear and convincing evidence that Jordan was acting on their behalf in his attempts to regain production from the well, thereby making use of the mineral servitude for their benefit.

Production

The Andrewses argue that Jordan did not obtain sufficient production to interrupt the running of prescription. They claim that Jordan got only a small amount of some substance out of a valve on the well one time and it was never proven to be oil. They also cite the comments to La. R.S. 31:88 in support of their argument that there must be sufficient production to put to a beneficial use. These claims are not supported by the record or the law.
The prescription of nonuse running against a mineral servitude is interrupted by good faith operations for the discovery and production of minerals. See La. R.S. 31:29. Prescription of nonuse is interrupted by the production of any mineral covered by the act creating the servitude. The interruption occurs on the date on which actual production begins and prescription commences anew from the date of cessation of actual production. La. R.S. 31:36. To interrupt prescription, it is not necessary that minerals be produced in paying quantities. It is necessary only that minerals factually be produced in good faith with the intent of saving or otherwise using them for some beneficial purpose. La. R.S. 31:38.
Jordan testified that no rods were broken in the well, but the pump was hung halfway down. He described the process he used to get the well pumping again. He said he jarred it loose by causing the rods to strike the pump. He stated it took several days to get the well “jarred aloose.” This process is called bumping the well. Jordan stated that the well was producing some oil. The well was connected to electricity and was put on a timer to pump for short periods of time each day. Electric company records show that the well used electricity from November 2001 through January 14, 2002.
Jordan testified that he went to the well every day for a few days and then started going every other day. Each time he went to the site, the well was operational and was pumping oil. He opened a bleeder valve and observed oil coming out of the well. One day, he took Sepulvado with him to the well site and he saw the well pumping. They obtained a sample of “pure oil” in an old bottle.
Jordan stated that he estimated the well produced between five to nine barrels of oil, but it was never enough to fill the gun barrel and flow into the storage tank. The well eventually stuck again and he was not able to start it pumping again.
This testimony and evidence show that Jordan obtained production from the well in late 2001 through January 14, 2002. Jordan testified that he observed the well pumping and his tests from the bleeder valve showed that it was producing oil.
li^The Andrewses argue that Jordan observed oil when he opened the bleeder *882 valve one time and that the substance was never analyzed and proven to be oil. Our reading of the record shows that Jordan observed oil on more than one occasion when he opened the bleeder valve. Further, there is nothing in the record to cause doubt that Jordan, who had decades of experience in the oil industry, knew oil when he saw it. His testimony was corroborated by Sepulvado, who also had extensive oil field experience.
The Andrewses are not correct in arguing that the amount of production achieved by Jordan was insufficient to satisfy the requirements of La. R.S. 31:38. That statute requires that minerals actually be produced in good faith, with the intent of saving or otherwise using them for some beneficial purpose. Jordan testified that he intended to achieve enough production to make money for himself and the mineral owners. The Andrewses cite, not the actual wording of the statute, but the comment, which states:
Article 38 is in harmony with the jurisprudence. Mays v. Hansbro, 222 La. [957] 557, 64 So.2d 232 (1953). The concept of production in paying quantities is peculiar to lease administration and is appropriate to the lessor-lessee relationship. However, the test for use of a servitude should not be that minerals be produced in paying quantities as long as the production is in good faith. Economically, it does not seem that a servitude owner or his lessee would be likely to continue a losing operation for any extended period of time. Therefore, as a matter of fact, it seems that more often than not production continued for any length of time will be in paying quantities. However, it is quite possible that production might be continued for a short period of time in good faith in an attempt to make a particular property pay. Even though unsuccessful, such attempts should be recognized as uses of mineral servitudes as long as they are in good faith and the production is put to beneficial use. [Emphasis supplied.]
The comment does not track the language of the statute. We find the better practice to be to apply the actual wording of the statute, which |2arequires that minerals be produced in good faith with the intent of saving or otherwise using them for some beneficial purpose. The record shows that Jordan produced oil in good faith, with the intent of saving or otherwise using them for some beneficial purpose.[4]

Operations

The Andrewses argue that the trial court erred in finding that the servitude owners proved that Jordan performed good faith operations. They claim that Jordan’s actions in “bumping” the well to restore production were not sufficient. They insist that he was required to make operations involving equipment actually in the bore hole to constitute good faith operations to restore production. They maintain that Jordan’s actions were not intimately connected with the resolution of the difficulty that caused the well to cease production in order for it to constitute *883 reworking. These arguments are without merit.[5]
After production has ceased and prescription has commenced anew, it may be interrupted by good faith operation conducted in accordance with the general principles of Articles 29 through 31 to restore production or to secure new production from the same well or mine, whether from the same geological formation or one different from that previously producing. La. R.S. 31:39. When prescription is interrupted, it commences anew from the laalast day on which operations are conducted in good faith to secure or restore production in paying quantities with reasonable expectation of success. La. R.S. 31:41.
In support of their argument, the An-drewses cite the comment to La. R.S. 31:39, which provides:
Article 39 treats a situation which has not yet been of importance in the jurisprudence. Nevertheless, it is one which might arise and warrants treatment in the Mineral Code. Once actual production of minerals has ceased, operations seeking to restore production or to secure new production from the same site may be conducted. It is felt that as long as such operations are conducted in good faith and in accordance with the basic principles stated in Articles 29 through 31, they should constitute an interruption of prescription.
Insofar as the petroleum industry is concerned, Article 39 should be construed to include any good faith reworking operations or operations for recompletion of the well in another sand that involve use of equipment in the well bore. Mere gathering of geological or geophysical information is not intended to suffice, though gathering such information might properly constitute part of an overall reworking operation interrupting prescription.
The Andrewses argue this comment requires the use of equipment in the well bore in order to qualify as a “good faith operation.” The Andrewses cite numerous eases under La. R.S. 31:29, which contemplate the initial drilling of a well to interrupt prescription on a mineral servitude. La. R.S. 31:39 addresses attempts to restore production or secure new production which will interrupt prescription. The comment clearly states that good faith reworking operations or operations for re-completion of the well in another sand that involve the use of equipment in the bore will interrupt prescription.
la/The definition of actions which would constitute “reworking” was discussed in Jardell v. Hillin Oil Co., 485 So.2d 919 (La. 1986). The court in Jardell considered prior jurisprudence which defined “reworking” as:
[A]ny process or procedure which you may undertake to either regain, increase or create new production in a well or activity to restore or increase production of a well that has been drilled [,] usually the second attempt or to work again on a well. In a well that has produced it would be an operation when the well came off of production or ceased production, and it would be an operation to maintain, restore, improve production.
See Harry Bourg Corp. v. Union Producing Co., 197 So.2d 172 (La. App. 1st Cir. 1967), writ refused, 250 La. 903, 199 So.2d 917 (1967). The court in Jardell also cited *884 prior Louisiana jurisprudence, finding that operations such as relegging the derrick, pulling tubing, strengthening and reinforcing a bridge, doping tubing and rods, and repairing a gas line, constitute reworking.
The Andrewses cite Jardell, in arguing that a reworking operation must be intimately connected with the resolution of the difficulty that caused the well to cease operation in order to constitute reworking. In this case, the well had ceased to produce because the pump was stuck. Jordan was able to unstick the pump and production from the well was restored, although for a short time. This result is consistent with the reasoning in Jardell, which stated:
For reworking to occur, it is necessary first that production has ceased or slowed down or has never been achieved. Reworking need not involve additional drilling. It is also clear that reworking operations encompass essential preparatory steps. Furthermore production need not be resumed during the delay.
The Jardell court also provided:
[A]n activity should be physically associated with the well site and intimately connected with the resolution of the difficulty |2fithat caused the well to cease production in order for it to constitute reworking. However, the presence of a workover rig at the well site was not found to be a necessary incident to a reworking operation[.]
The court in Jardell ultimately concluded that timely essential preparatory steps directly related to resolving the difficulty were part of reworking operations. Under this reasoning, Jordan’s actions in this case in jarring the well in order to cause the pump to function constituted a sufficient good faith reworking operation to inter-rapt prescription under La. R.S. 31:39.[6]

Inconsistent Testimony

The Andrewses urge this court to discount the testimony of Jordan because he was unclear about the type of wellhead used on Rogers No. 1 Well, did not know which gun barrel the well produced into, and did not have records to show that he paid the electric bills on the well in 2001 and 2002. They also claim that the testimony of Sepulvado was inconsistent and should not be used to corroborate Jordan’s testimony. These claims are without merit.
Where documents or objective evidence so contradict a witness’s story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit it, then the appellate court may well find manifest error. But if such factors are not present, and a fact finder’s finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Magee v. Worley, supra.
| an Jordan testified that he was originally wrong in describing the wellhead configuration. He explained that it had been several years since he had been to the well and he had worked on hundreds of wells. Jordan’s trial testimony showed that there was some confusion as to how the tanks and gun barrels were labeled, but did not reveal any confusion as to how the oil flowed from the well.
Jordan testified that he had the electric meter at the well placed in his name after he became the operator, but he had no *885 records to prove it. Exhibits filed into the record include the records from the electric company showing that the well used electricity from November 29, 2001, through January 14, 2002. The company’s response to the subpoena for its records indicates that the customer records were purged after 10 years. Whether Jordan had the electric meter in his name or whether he paid the bill is not important in this matter. What is relevant is that the electric company records show that electricity was used at the well from November 2001 through January 2002. Electricity was used to run the pump on the well. There was no credible testimony that electricity was used at the site for any other purpose.
Sepulvado testified that he was familiar with the well. He was asked about going to the well site from 1997-2001. He stated he was there several times and that the well pumped when it had electricity. He said he went to the site on one occasion with Jordan after the lease was assigned to Jordan and he had gotten the well to pump again. Sepulvado said the well was operating, meaning it was producing oil. According to Sepulvado, he saw a one-inch stream of oil coming out of the bleeder valve while the well was pumping. He stated there was no doubt that the substance was oil. He | a7testified that it was not old oil stuck in the valve because the pump was pumping.
The documents and objective evidence support Jordan’s testimony. The testimony of both Jordan and Sepulvado was obviously believed by the trial court and is not so internally inconsistent or implausible on its face that a reasonable fact finder would not credit it. Therefore, the trial court did not err in accepting the testimony of these witnesses.
Unitization and Unit Activities
In arguing that Jordan’s activities did not interrupt prescription, the An-drewses attempt to show that more than 10 years passed before additional use of the mineral servitudes was made. They urge that the trial court erred in accepting inaccurate dates for the next operations and production attributable to the property covered by the servitudes. These arguments are without merit.
After Jordan’s activities, the Rogers No. 1 Well stopped producing on January 14, 2002, the last date electricity was used. The servitude prescription began to run anew on January 15, 2002, and the servitude owners had until January 15, 2012, to interrupt the running of prescription. The next events affecting the property occurred in and after 2008, when Sections 32 and 33 were unitized for drilling in the Haynesville Formation.
As argued by the servitude owners, the parties stipulated in the pretrial order that Section 32 was unitized on July 1, 2009. They also stipulated that the Ford Family Trust LLC 29 Well (a/k/a the HA RA SUU Ford Family Trust LLC 32H Well) is located in Section 29, and became a horizontal well entering the unitized interval located in Section 32. As stipulated by the parties, this well was permitted as the unit well for Section 32 on December | ¾⅜20, 2009. The parties also stipulated that re-drilling operations on this well began on January 18, 2010. An alternate unit well for Section 32 was spudded on October 22, 2010, and has been producing since January 1, 2011.
The parties stipulated that Section 33 was unitized on July 29, 2008, and the Billy Joe Andrews 33 No. 1 Well was designated as the unit well in the unitization order.
A stipulation has the effect of a judicial admission or confession which binds all parties and the court. Stipulations between the parties in a specific case are binding on the trial court when not in derogation of law, and are the law of the case. It is well settled that a stipulation *886 amounts to full proof against those who made it. It has the effect of withdrawing a fact from issue and disposing wholly with the need for proof of that fact. Luquette v. Allstate Ins. (Indem.) Co., 50,177 (La.App. 2 Cir. 8/12/15), 174 So.3d 736, writ denied, 2015-1641 (La. 10/30/15), 180 So.3d 300. See also R.J. D’Hemecourt Petroleum, Inc. v. McNamara, 444 So.2d 600 (La. 1983); Becht v. Morgan Bldg. & Spas, Inc., 2002-2047 (La. 4/23/03), 843 So.2d 1109.
The Andrewses are bound by the dates contained in the stipulation. In any event, the record clearly shows that the prescription of nonuse had not run on the mineral servitudes, and the Smith hems and Ameri-tas are the rightful owners of the mineral servitudes at issue here.
CONCLUSION
For the reasons stated above, we affirm the judgment of the trial court in its entirety. The trial court was correct in finding that the mineral servitudes in favor of the Smith heirs, Daniel Joseph Smith, Patricia Marie | ggSmith Maloy, and Margaret Linn Smith, widow of Dewitt Rogers Smith, and Ameritas Life Insurance Corporation, are still in effect and have not prescribed through nonuse. We also affirm the trial court judgment dismissing with prejudice all claims asserted by Ameritas against Quest Energies LLC, David Og-wyn, and Terry Dale Jordan, and all claims of Billy Joe Andrews and Betty Ruth Andrews, including claims for damages against the Smith heirs and Ameritas for failing to release the mineral servi-tudes. All costs in this court are assessed to Billy Joe Andrews and Betty Ruth Andrews.
AFFIRMED.

. On July 1, 2014, Union Central merged out of existence and into Ameritas.

. The Andrewses sold small portions of their properly to others who were joined in this suit, but who did not make an appearance and who are not relevant to the disposition of this matter. The Andrewses also claimed surface damages. That claim was bifurcated from the servitude disputes at issue here.

. The Andrewses have not argued on appeal that the trial court erred in finding Mr. Andrews not credible and in rejecting his testimony in its entirety. After reviewing this large record, we agree with the trial court's assessment of the testimony of Mr. Andrews and its finding on this critical issue.

. The Andrewses cite the case of Magee v. Worley, supra, to support its argument that production cannot be shown by the personal account of a party, without empirical corroboration. In Magee, the trial court originally granted summary judgment to servitude owners who sought to show that prescription was interrupted by use of gas from a well to fuel their house. This court reversed the summary judgment and, after a bench trial, the trial court entered judgment for the surface owners, finding that the servitude had terminated. In Magee, there was substantial proof to show that the servitude owner never used gas from a shut-in gas well, as he claimed. The facts of that case are distinguishable from those in this matter.

. As set forth above, Jordan achieved actual production from the well sufficient to interrupt prescription under La. R.S. 31:36 and 38. A consideration of whether he carried out sufficient good faith operations under La. R.S. 31:39 is not necessary. However, we find that Jordan’s actions satisfy this statute.

. The Andrewses argue that the phrase “that involve use of equipment in the well bore’’ modifies reworking operations, as well as operations for recompletion. As set forth above, the definition of "reworking’’ has been considered in the jurisprudence and does not require use of equipment in the well bore.