Judgment rendered August 28, 2024.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 55,798-CA
No. 55,799-CA
(Consolidated Cases)

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

No. 55,798-CA

RICK D. GANEY, ET AL                              Plaintiffs-
                                                  Appellees

versus

BETH GRANBERRY CUPSTID, ET AL                     Defendants-
                                                  Appellants

* * * * *
*consolidated with*

* * * * *

No. 55,799-CA

JASON TAYLOR THORNTON                             Plaintiff-Appellee

versus

BETH GRANBERRY CUPSTID, ET AL                     Defendants-
                                                  Appellants

* * * * * *

Appealed from the
Forty-Second Judicial District Court for the
Parish of DeSoto, Louisiana
Trial Court Nos. 73,827 and 74,209

Honorable Amy Burford McCartney, Judge

* * * * *

DAVIDSON, SUMMERS, HEARNE, MARTIN & POWELL, LLC
By: Wm Lake Hearne, Jr.
J. Davis Powell

Counsel for Defendants-Appellants, George W. Lassett, III, and Deborah L. Duncan

BETHARD & BETHARD, LLP
By: Benjamin T. Bethard
Matthew S. Kelley

Counsel for Plaintiffs-Appellees, Rick D. Ganey, Jason Taylor Thornton, Kathy Renee Broadway and Travis A. Broadway

* * * * *

Before COX, MARCOTTE, and ELLENDER, JJ.

**MARCOTTE, J.**

These consolidated appeals arise from the 42nd Judicial District Court, Parish of DeSoto, the Honorable Amy Burford McCartney presiding. Appellants-Defendants appeal the trial court's rulings: 1) denying defendants' motion for summary judgment; 2) finding in favor of plaintiffs at trial that defendants' well stopped producing on or before May 1999, defendants' mineral servitude was extinguished by 10 years nonuse, and defendants' servitude terminated and was extinguished prior to the spudding of the Robertson well; and 3) finding in favor of plaintiffs after a new trial was held. For the following reasons, we affirm the trial court's rulings.

On June 20, 2012, plaintiffs, Rick D. Ganey ("Ganey"), Travis A. Broadway ("Mr. Broadway"), and Kathy Broadway (together, the "Broadways") sued nine individuals, including George Lassett and Josephine Lassett (the "Lassetts"),[1] and three business entities, Comstock Oil and Gas-Louisiana, Inc. ("Comstock"), Encana Oil and Gas (USA), Inc. ("Encana"), and SWEPI, L.P. ("SWEPI"). At the time of the suit, the Broadways were the surface owners and owners of ½ interest of the minerals and Ganey was the owner of ½ interest of the minerals of a tract of property located in Sections 25 and 30 in DeSoto Parish, Louisiana (the "Property"), as described in the trial court's rulings. Later, Ganey purchased the Property from the Broadways, who retained their mineral interest. Defendants consisted of the Lassetts and the Fairs, the owners of two distinct mineral servitudes (the "Fair Servitude" and the "Lassett Servitude") on the Property

---

[1] George and Josephine both died during the litigation and were substituted by their legatees, George W. Lassett, III, and Deborah L. Duncan (also referred to as the "Lassetts").

and the Fairs' and Lassetts' mineral lessees. Plaintiffs sought a determination that defendants' mineral servitudes and leases terminated by a failure of operations or production for a period exceeding 10 years.[2]

The petition stated that a well was spud[3] on the Property on December 9, 1980, referred to in the petition as the "Fair-Lassett No. 1 Well" (the "FL1 Well"). The operator of the FL1 Well was Jeems Bayou Production Corporation ("Jeems"). Plaintiffs claimed that the reported production for the FL1 Well was inaccurate, it did not produce any minerals after May 1, 1999, and there were no acts which would have interrupted prescription until July 15, 2009, when the Robertson well was spud. Plaintiffs claimed damages related to and including the loss of royalties and lease bonuses and attorney fees.[4]

The Lassetts filed exceptions and answered the petition denying plaintiffs' claims. They stated that they owned their mineral servitude between May 1999 and May 2009, and they granted a mineral lease to Amoco Production Company ("Amoco"), which subleased to Jeems. The Lassetts filed a third-party demand against Jeems, making claims related to the certified production reports the company filed with the Commissioner of Conservation ("COC") which showed that natural gas production was obtained from the FL1 Well from June 1981 until April 2000. The Lassetts

_____

[2] The Fairs and their mineral lessees filed motions for summary judgment showing that the Fair Servitude was maintained. The trial court granted the motions and dismissed plaintiffs' claims regarding the Fair Servitude.

[3] "Spudding" means to begin drilling operations.

[4] Jason Thornton ("Thornton") and two other plaintiffs groups filed identical suits against the Lassetts and other defendants. While the suit was pending, Thornton sold the surface rights to his part of the Property to Ganey while reserving the mineral rights. The cases were eventually consolidated with the suit brought by Ganey and the Broadways. Later, the other plaintiffs' groups cases were voluntarily dismissed, but Thornton's claims remained.

2

stated that they relied upon those reports to their detriment. Jeems answered the third-party demand and denied the allegations.

On October 25, 2016, Encana and SWEPI filed a joint motion for summary judgment. The Lassetts then filed a motion for summary judgment, adopting the facts and reasons asserted in the motion filed by Encana and SWEPI. The Lassetts asserted that their servitude was created on August 6, 1979, the FL1 Well was spud on the Property on December 9, 1980, and it produced natural gas through April 2000. On July 15, 2009, the Robertson well was spud, and on September 4, 2009, the Calhoun well was spud, both of which interrupted prescription of nonuse for the Lassett Servitude. The Robertson and Calhoun wells consistently produced natural gas since their spudding.

The Lassetts attached to their motion certified production reports and disposition reports submitted by Jeems to the COC. Each third-party transporter identified in Jeems' disposition report filed certified independent disposition reports showing the receipt of gas from Jeems, which Jeems claimed matched its production reports.

Plaintiffs opposed the motions for summary judgment. They stated that Jeems' reporting about the FL1 Well's production was inaccurate. Plaintiffs attached the following exhibits to their opposition:

> 1) A purported affidavit signed by H.E. Sutton ("Sutton"), the president of Jeems, in which he stated that he reviewed Jeems' records at Ganey's request and determined that the production reported to the COC for the FL1 Well from May 1, 1999, was in error. The purported affidavit was dated, but it was not notarized.

> 2) A second purported affidavit signed by Sutton, which was not dated or notarized. It stated that Jeems reported the production from the FL1 Well through April 1, 2000. The affidavit then states, "Production reports sent to the Louisiana

3

Commissioner of Conservation for this well from at least May 1, 1999, to April 1, 2000, were not true." The words "not true" were marked out in ink and the word "inaccurate" was handwritten beside the marked-out language. The affidavit stated that the FL1 Well did not produce any minerals after May 1, 1999, and no operations or tests were performed on the FL1 Well from May 1, 1999, to present.

3) A third affidavit signed by Sutton which was notarized. Sutton's third affidavit was identical to his second, but the words "not true" did not appear and were replaced with the typewritten word "inaccurate."

4) An affidavit signed by Thornton. Thornton said that he was 6 years old in 1981 and lived on property adjacent to the Property. He rode motorcycles and 4-wheelers around the pasture where the FL1 Well was located. He was familiar with the site, which always had high weeds around it. Thornton said that his father was a well operator, so he was familiar with what was required to check a well, and he saw none of those sorts of activities occurring at the FL1 Well site, which he likely would have observed. He also stated that there was no access road to the FL1 Well.

5) An affidavit signed by Hubert Blanchard ("Blanchard"). Blanchard lived adjacent to the Property and built his current home in 1981. At the time, Jeems used a right-of-way to access the FL1 Well. The well itself was located about 50 to 100 feet from Blanchard's property line. Blanchard stated that for several years the land around the FL1 Well was pasture and was regularly bushhogged.

Blanchard stated that Jeems' activity at the well site ended about six months after Blanchard moved to his property, and in 1982 or 1983, a restaurant located nearby built a chain-link fence across the right-of-way previously used by Jeems. Blanchard planted hedges along the fence for privacy and he had not observed anyone working or monitoring the FL1 Well since mid-1982. The only subsequent activity he observed at the FL1 Well was the plugging of the FL1 Well which, occurred in 2011 or 2012.

6) Deposition testimony from Blanchard, Sutton, and Thornton.

The Lassetts replied to plaintiffs' opposition and objected to the attached affidavits. The Lassetts stated that Sutton gave deposition testimony that he did not create, file, or monitor production reports for Jeems and that when he signed the affidavits, he did not review Jeems'

4

records beforehand, but only signed the affidavits because his nephew and employee, Stan Smith ("Smith"), asked him to. The Lassetts stated that Smith testified at his deposition that Jeems gave Ganey the affidavits in exchange for settling a damage claim Ganey made, and Sutton's affidavits were "inventions of Ganey" made to persuade defendants into forfeiting their mineral rights. The Lassetts contended that Sutton was not competent to testify about the FL1 Well's production.

The Lassetts attached Sutton's deposition testimony to their reply/objection. Sutton testified that he was 80 years old and that his nephew (Smith) handed him a "release" and he "just signed it." He said that he did not inquire about what he was signing, investigate what was stated in the affidavit, or review any records in signing it. Sutton stated that he never spoke with Ganey and had never met him.

The Lassetts attached Smith's deposition testimony to their reply/objection. Smith stated that he met with Ganey on his property near the FL1 Well site to look at a leaking compressor which was owned by Jeems and attached to an unrelated well. Ganey offered to release Jeems from liability for the damage caused by the leaking compressor if Jeems "released" the lease concerning the FL1 Well. Smith said that Ganey proposed that there had been no production from the FL1 Well for a couple of years because Ganey observed that the pipeline leaving the location was unhooked and there were trees growing around the wellhead. Smith said, "So, he felt like that it was at least two years, if I recall, 18 months to two years in error."

Smith testified that the only records he reviewed were the SONRIS[5] reports, which he said contradicted what Ganey told him about the FL1 Well's production. Smith agreed that Sutton's affidavit statement was based on what Ganey told Smith and not what Sutton saw on SONRIS.

The Lassetts asked that Sutton's unsworn affidavits be stricken as they were not based on personal knowledge and were not notarized. They also asked that Sutton's sworn affidavit be stricken because it was notarized by Smith and did not state on its face that it was based on Sutton's personal knowledge, information, or belief. The Lassetts said that Sutton testified at deposition that he had no personal knowledge of the information stated in the affidavits. The Lassetts also pointed out the *quid pro quo* nature of the affidavits, alleging that Ganey offered to release his environmental damage claim against Jeems if it released the FL1 mineral lease.

The trial court denied both motions for summary judgment. The trial court refused to consider the two purported affidavits signed by Sutton because the court said they were signed statements and were not one of the exclusive documents listed in La. C.C.P. art. 966. The court did not consider any of the exhibits attached to defendants' reply. The court stated that it considered Sutton's notarized affidavit, which called into question the veracity of the COC records about whether the FL1 Well produced any minerals from May 1, 1999, to April 1, 2000. The court found that created a genuine issue of material fact.[6]

---

[5] SONRIS stands for Strategic Online Natural Resources Information System and is the database maintained by the COC for operators and transporters to report well information such as production, disposition, and testing, etc.

[6] The plaintiffs later filed a joint motion to dismiss with defendants SWEPI, Comstock, and Encana. On March 22, 2018, the trial court granted the motion, and the claims against those three defendants were dismissed with prejudice.

A bench trial was held August 30-31, 2021. Ganey testified that he first started going to the Property in 2005 and acquired the Property in 2016. Ganey continuously ran cattle on the Property starting in 2005 and bushhogged the Property to maintain it. He first discovered the FL1 Well in 2007 or 2008 and described it as "just some pipe that came out of the ground and it had a square box on it." Ganey said that it had trees growing through it. Ganey described seeing a chart on the FL1 Well that had a pen attached to it. The chart was yellow and faded, but he saw a date on it that was from the 1980s.

Ganey said he discussed the mineral rights with Mr. Broadway, who believed the rights had prescribed; they decided to split the mineral rights evenly between themselves. Ganey testified that the pasture where the well was located was fully enclosed with a fence containing locked gates and he saw no signs of anyone accessing the well. Ganey did SONRIS research in 2008 on the FL1 Well's production. Ganey said that once the suit was filed, the well was plugged; he had to unlock the gate to allow access to the well. Ganey had Smith look at the FL1 Well and its production; Ganey alleged that Smith thought the production was "wrong."

Ganey discussed a compressor owned by Jeems located on another part of the Property that was loud and leaking oil, which Jeems later removed. Letters from Jeems to Ganey were introduced. Smith wrote in one letter that Jeems believed that "no charts" were recovered from the FL1 Well since the late 1990s, and no pipelines capable of carrying gas remained on the Property since the late 1990s. Smith's letter said that trees were growing around the FL1 Well which were more than 10 years old.

Another letter from Jeems to Ganey said, "In turn for the release, I ask you to sign the bottom of the letter simply agreeing to our verbal agreement that you will continue to release Jeems Bayou." Ganey said he released Jeems from any obligations related to the cleanup of the pumping station where the compressor leaked oil. He testified that Jeems did clean up the station. Ganey said that he did not recall any conversation with Smith about changing the date listed in the release from May 1, 2000, to May 1, 1999.

The SONRIS well information file for the FL1 Well was admitted. The reported gas production for the FL1 Well for May 1999 to May 2000 is as follows:

| | |
|---|---|
| May 1999 | 3 MCF |
| June 1999 | 2 |
| July 1999 | 0 |
| August 1999 | 2 |
| September 1999 | 1 |
| October 1999 | 1 |
| November 1999 | 2 |
| December 1999 | 5 |
| January 2000 | 0 |
| February 2000 | 2 |
| March 2000 | 3 |
| April 2000 | 2 |
| May 2000 | 0 |

Mr. Broadway testified that he acquired the Property in 1992 to run cattle and for recreation. He had a verbal agreement with Ganey that he could access the Property, and he later sold the Property to Ganey. The entire Property was fenced in, and Mr. Broadway was on the Property regularly and never saw anyone there without his permission. Mr. Broadway was asked about a different well on the Property, the Cottonbelt well, that was actively maintained and produced natural gas when Mr. Broadway first purchased the Property. He stated that people accessed the Cottonbelt well three times a week. He said that pumpers who accessed the

Cottonbelt well left the gate open repeatedly, letting cattle out onto the highway, which happened for several years. He never saw anyone access the FL1 Well during his ownership and did not recall anyone asking him for access to that location while he owned the Property.

Mr. Broadway mowed and sprayed the land around the FL1 Well and said that it was always a "grown up mess" with "pipe scattered everywhere." There never appeared to be any access to the FL1 Well, and Mr. Broadway did not see any tanks or tank batteries near the well. He said that there were trees growing through the well site when he purchased the Property in 1992.

Blanchard testified that he moved into a house adjacent to the Property in 1981. At that time, he saw a truck drive to the FL1 Well to check it a couple of times a week, usually in the mornings, after he returned home from his night shift work. A couple of years after he moved in, he stopped seeing anyone approaching the site. Blanchard testified that a restaurant moved to the property near his house and put a chain link fence up between the restaurant's property and his, cutting off access to the well site. Blanchard planted shrubs on his side of the fence for privacy.

Blanchard did not see anyone accessing the FL1 Well after that. He and his son rode dirt bikes in the pasture where the FL1 Well was located until the Property was fenced in by the owner in the early 1990s. Blanchard testified that it was about 75 feet between the FL1 Well and his back fence. Around the time Blanchard retired in 2010 or 2011, he saw people at the FL1 Well pulling out pipe. He spoke with them, and they told him that the state required that old wellheads had to be pulled up and the wells capped, which was what they were doing. On cross-examination, Blanchard said he

9

put a privacy fence around his pool in 1983, which blocked his view of the FL1 Well from his house.

Thornton testified that he lived on land adjacent to the Property starting in 1981 when he was six years old. He lived there until 1994 or 1995, but his parents lived in that house until 2002 or 2003. He regularly rode ATVs and bikes in the area around his house, including the FL1 Well site, and he did not recall seeing anyone at the site checking the well. Thornton recalled seeing the Cottonbelt well from his house. There was a tank battery and a noisy compressor on the Cottonbelt well and vehicles were often around it. Thornton said the FL1 Well was overgrown and that the area around the well was cleared and mowed, but not the FL1 Well itself.

On cross-examination, Thornton stated that he drove to ATV races, sometimes as far away as New York, from March to September from 1988 to 1995, meaning he spent a lot of time away from his home. Thornton moved back to his family's property in 2008. He said he could see the FL1 Well itself from his house if the area around it was mowed.

Sutton testified that he was the president of Jeems and had been since at least the 1980s. Plaintiffs' counsel reviewed with Sutton several documents he signed, including releases and affidavits. He could not recall signing all of them. Defense counsel objected to the admission of the affidavits as hearsay. The trial court sustained the objection, stating that plaintiffs' counsel could ask Sutton about his affidavits, but the affidavits were not admissible. Sutton agreed that he signed the affidavits but said that he did not prepare them. He said that the statement in the affidavits about there being no production at the FL1 Well from May 1, 1999, to present, "must be true if I signed it." He then said, "I don't remember any of this. I

10

don't know." When asked if the assertion in his affidavits that there was no testing done on the FL1 Well was correct, Sutton said, "Undoubtedly, I signed it because that's true. I'm assuming that's right."

Sutton repeatedly said that a document he signed must have been true at the time if he signed it. Defense counsel repeatedly objected to the entirety of Sutton's testimony as hearsay, saying that he had no personal knowledge of what he was testifying about except that he signed the document. The trial court overruled the objections. Defense counsel objected again to the admission of Sutton's affidavits. Plaintiffs' counsel proffered the affidavits, and the trial court stated it would take the matter under advisement and rule on their admissibility later.

Sutton stated that as Jeems' president, he oversaw production on hundreds of wells, and the company used charts that were changed weekly for its wells. Sutton said that Jeems had made errors in its reporting to the COC in the past. Sutton repeatedly referenced his age as 88 years old, saying that he could not be sure of things that happened 20 years ago.

On cross-examination, when asked if he read the affidavits before he signed them, Sutton responded, "I'm sure I did, but I can't guarantee that. I'm pretty sure I did." Defense counsel read some of Sutton's deposition testimony in which he stated that he did not read the affidavits when he signed them, that he only signed the affidavits because Smith asked him to, and that he did not personally investigate any of the facts asserted in his affidavits. When asked about the FL1 Well in particular, Sutton could not recall any details about its production or any operations related to it. He agreed that Jeems would continue to produce a well as long as it could and would only stop doing so when it quit making any gas.

Smith testified that he had been a landman for 42 years. On direct examination, Smith often could not recall details of documents he signed, including releases and letters he wrote, but he did acknowledge his signature on each document. He testified that he could not remember specific details from his conversations with Ganey. He said he did not remember writing letters that he signed. He acknowledged a letter that he wrote to Ganey, which included an attachment which stated, "In return for this release, I ask that you sign the bottom of this letter simply agreeing to our verbal agreement that you will continue to release Jeems Bayou of any surface liability for the site once occupied by our compressor."

When asked if he prepared or revised the Sutton affidavits, Smith could not definitively state that he did so. Smith stated that he could not testify about the charts that Jeems used for recording mineral production for their wells.

On cross-examination, Smith testified that he was not involved in the production reporting for Jeems. He said that he accessed the COC records for production data for a particular well. He said he did not look at the actual reports that Jeems made to the COC but accessed the information solely from the COC's SONRIS site. He said that he did not compare what the production was said to be on the SONRIS well information page with disposition reports that Jeems filed with the COC. Smith testified that he did not question any Jeems employees to determine who filed the FL1 Well disposition reports or ascertain what was in the reports. The following exchange was then had:

> Q: So what about the SONRIS information made you think that
> the recording that Jeems Bayou did was inaccurate?

12

A: I don't know that I was necessarily as concerned about it, accuracy or inaccuracy, as I was—my top priority was settling damages—

Q: Right.

A: And I was trying to do that and facilitate that as easily and as inexpensively as possible.

Q: And so in exchange for a release of surface liability, you gave what Mr. Ganey wanted, which was a release of the lease. Is that correct?

A: Yes, sir.

Q: And later he came back and said, well, I need an affidavit, and it was a little different than your release, correct?

A: Yes.

Q: But it didn't matter to you, did it?

A: Certainly not.

Q: Okay. So, you didn't see a distinction between granting a release and granting this affidavit. Is that correct?

A: No.

Smith testified that he had no personal knowledge about the FL1 Well, he had never checked the meter on the FL1 Well, and he did not know how to check the meter. He agreed that the operations and testing of the FL1 Well were outside the scope of his employment.

On redirect, Smith said that he was unaware if Sutton attempted to do any research on the FL1 Well but said that it was highly unlikely because it was something Sutton would have asked him to do. Smith agreed that any affidavits signed regarding production for the FL1 Well occurred after 2011, when Ganey granted Jeems a release for any surface damage on the Property. When asked if he thought he did not owe Ganey anything after he got the release for the surface damage, Smith said he believed it was part of

13

his agreement with Ganey to give him the affidavits in return for the release of liability. Smith said he had an attorney look over the affidavits when drafting them. When asked if he agreed that if someone was signing an affidavit, that person was signing it for a reason, Smith said, "I didn't know what the reason was and didn't care. I was trying to cooperate with Mr. Ganey."

Bruce Orf ("Orf") was accepted as an expert in natural gas measurement with a specialty in orifice measurement. Orf testified about the FL1 Well's production between 1997 and 2000 and said that he had never seen a well with monthly volume that low. Orf said that fluid build-up in a well could lead to false readings showing production, which was typically seen on low-volume wells. Orf said that accurate readings also depended on the meter run size and bore/orifice size. Orf said that the FL1 Well had a two-inch line from the meter run, and the smallest plate that could be placed on a run of that size was ¼ inch. He said, "[I]f the flow goes below that, then you can't change to a smaller hole than that. It doesn't follow guidelines. So, you can't raise the differential anymore. So, it just reads lower and lower on the chart."

Orf also said that some of the lines bleeding and humidity could affect a well's readings. Orf said of marginal wells that they could be "shut in" for a period and build up pressure and then could produce more afterward. He stated that with an orifice chart of less than one MCF per month, he would not be able to interpret that chart and would think that well generated a false reading. Using conditions favorable to Jeems, Orf testified that the lowest possible production that could be read and reported for the FL1 Well would be 2 ½ MCF, but such production would have to occur over a period of

14

hours and not days. Orf estimated that it cost about $300/month to have a well chart read.

On cross-examination, Orf stated that he did not review the charts for the FL1 Well and was unfamiliar with the operations of the FL1 Well. On redirect, Orf agreed that if someone were to close a well and open it back up, someone would physically have to be at the well to do so.

Rebecca Henry ("Henry"), a manager over the production audit section at the COC, testified that her division audited monthly oil and gas production and transportation reports for discrepancies. Henry explained that a transporter's disposition report, called an R5T report, required that gas transporters report where they received their gas, from which well site, and how they disposed of the gas. An operator's gas disposition report, called an R5D report, showed how much gas operators produced in the field, if they acquired gas from another operator, and where they disposed of it. The R5D report showed how much gas came from a particular field, but not a particular well.

Henry said that the OGP report, the operator's oil and gas monthly production report, showed how much each well was producing. The R5D report was the total production for all wells in a field, so the R5D and OGP report totals for production should have matched. Henry stated that if the total production matched, there was nothing the COC did to verify that any one well's production was accurately reported to the COC.

Patrick Raley ("Raley"), the Shreveport District Manager for the COC, testified about DT-1 deliverability tests. He stated that a DT-1 test involved an operator testing what a well produced during a 24-hour period. He agreed that a DT-1 test required that an operator visit the well site to

15

perform the test. The test had to be performed every six months, and any gas produced during the DT-1 test was metered and sold. Raley reviewed the FL1 Well's November 2006 DT-1 report which showed that it produced 10 MCF. Raley stated that the amount reported in the DT-1 report, reflecting a 24-hour period, was multiplied by 30. So, the amount expected to be produced monthly from the FL1 Well for that month was 300 MCF. Raley said that the COC did not verify the accuracy of what an operator reported in its DT-1 test results.

Dr. George Castille, III ("Dr. Castille") was admitted as an expert in geography and aerial photo interpretation, particularly in reviewing photographs of oil and gas fields for evidence of oil and gas activity and of how the land changed because of that activity. He reviewed an aerial photo of the FL1 Well site from 1982, which showed a cleared area with a path leading to it. Several other aerial photographs were admitted from various years after 1982. Dr. Castille stated that a 1988 photograph showed little evidence of the access path to the FL1 Well that existed in 1982; he noted where single-track marks could be seen on the photograph, like those a dirt bike would make, as opposed to the double track marks that a four-wheel vehicle would make.

A 1994 photograph of the FL1 Well site showed vegetation growing around the well. Dr. Castille said it was uncommon to see vegetation growing around an active well. A 1998 aerial photo showed even denser vegetation and larger trees growing throughout the FL1 Well site. Dr. Castille said that the FL1 Well site looked like an abandoned well site in that photo. He also noted the fence surrounding the Blanchard property which cut across the path that provided access to the FL1 Well site. He said the

16

same of photographs of the site from 2004 and 2010. He said that the well was plugged in 2011, and a 2012 photograph of the site showed some vegetation had been removed.

In 2020, Dr. Castille went to the FL1 Well site and took photographs. He said that the area where the FL1 Well was located had small trees growing there that were as big around as his arm. He also said that the other trees at the site were undisturbed by the FL1 Well being plugged, but he estimated that those trees were older than the younger ones near the well; he approximated that those trees were 20-30 years old.

Homer Peel ("Peel") testified as an expert in database research and analysis; he specialized in SONRIS research. Peel reviewed the SONRIS well information file for the FL1 Well and other wells in the same reservoir that were producing gas. Peel said that of the 16 producing wells in the same reservoir, all underwent a sharp decrease in production in their third or fourth year following drilling.

Peel noted that in several instances, the DT-1 tests for the FL1 Well showed that the deliverability of the amount of natural gas in the FL1 Well did not match the production reported for the same month. He pointed out that between 1995 and 1999, the DT-1 tests for the FL1 Well showed 10 MCF produced, but in all but 2 months when the DT-1 tests were performed, the reported monthly production for the FL1 Well was less than 10 MCF. Peel also testified that he could not find the five months' worth of production reporting for the FL1 Well for January 1984 to May 1984 on the SONRIS website. Peel said learning that there was an operator's affidavit stating that there were production reporting inaccuracies to the COC would affect his evaluation and the guidance that he offered to a mineral buyer.

17

The defense's sole witness, Laura Fitzgerald ("Fitzgerald"), was admitted as an expert in oil, gas, and mineral records research and acquisition. She reviewed the COC's well records and production reports about the FL1 Well to figure out if the mineral servitude at issue had prescribed. She testified that the Lassett mineral servitude was maintained through April 2010 by production from the FL1 Well. She testified that the reported production information for the FL1 Well was accurate.

On cross-examination, Fitzgerald was asked to read a portion of her deposition testimony in which she stated that there "were many errors in the well content files." Fitzgerald disagreed that there were errors in the production report for the FL1 Well but agreed that there were "possibly" errors in the whole well information file for the FL1 Well. When asked if the reported DT-1 test results for the FL1 Well could have been the test results for another Fair-Lassett well, she responded, "Possibly." When asked if the same could be true for the production numbers report for the FL1 Well, Fitzgerald disagreed. Fitzgerald was asked to read her deposition testimony in which she agreed that the production reported for April 2000 for the FL1 Well could have been the actual production reported for another well.

Fitzgerald was asked if it would affect how she advised her client about whether to purchase an asset if she, as a title examiner, reviewed a well information report containing the same information as that of the FL1 Well and was given an operator's affidavit which said that what was reported to the COC was inaccurate. She stated that she would have to rely on the COC report.

On March 2, 2022, following post-trial briefing, the trial court issued its written reasons for judgment. The trial court summarized the testimony of each witness and made the following comments. The trial court noted Blanchard's testimony about the fence and shrubs that eliminated access to the road previously used to access the FL1 Well. The trial court said of Sutton's testimony that he consistently testified that he did not recall signing the affidavits, but he verified his signatures and stated he would not have signed the documents if they were not correct at the time. The court noted that Sutton testified that the statements in his affidavits about the FL1 Well having no production from May 1, 1999, were accurate.

The trial court pointed out that, on direct examination, Smith had trouble remembering several exhibits in which he had a hand preparing. The trial court then said that Smith's memory "improved substantially" on cross-examination. The trial court stated that Smith did not compare the Jeems production reports to those found on the SONRIS site, did not compare Jeems' production and disposition reports to each other, and did not ask any Jeems employees about the reports or ask about who filed the reports for Jeems. The court noted that Smith only appeared concerned with the accuracy or inaccuracy of the SONRIS records and that his main priority was settling surface damages with Ganey. The trial court found that Smith "lacked candor" in his testimony.

In summarizing Henry's testimony, the court pointed out that the COC does not independently verify the accuracy of operator's reporting. In summarizing Fitzgerald's testimony, the trial court said that it found her testimony "incredulous" regarding her consideration of an operator's affidavit stating that it made production reporting errors to the COC. The

19

court said that Fitzgerald testified as an interested party instead of as an unbiased expert. The court stated that it found Fitzgerald's expert opinion unreliable and did not afford her testimony any weight.

The trial court said that it admitted Sutton's three affidavits as non-hearsay statements because Jeems was a party to the suit, Sutton was the president of Jeems, and, while he did not recall any facts relative to the FL1 Well, he was adamant that he would not have signed the affidavits unless they were true.

The trial court found that the SONRIS production reports for the FL1 Well were *prima facie* evidence that it had produced natural gas through April 2000. The court then highlighted the inconsistencies found in SONRIS between the well's DT-1 tests and its production volume, both reported by Jeems. The court stated that in any month that a DT-1 test was performed, the reported production for that month should not have been less than what was produced during the DT-1 test.

The following is a chart comparing the FL1 Well's reported production and its DT-1 test results for the corresponding months from May 1995 to May 2000:

| Test Date | DT-1 Test Result | Production Month | Reported Production |
|---|---|---|---|
| 5/16/95 | 10 MCF | 5/1995 | 8 MCF |
| 8/22/95 | 10 | 8/1995 | 15 |
| 11/14/95 | 10 | 11/1995 | 6 |
| 2/14/96 | 10 | 2/1996 | 12 |
| 5/24/96 | 10 | 5/1996 | 7 |
| 8/15/96 | 10 | 8/1996 | 9 |
| 11/7/96 | 10 | 11/1996 | 4 |
| 2/20/97 | 10 | 2/1997 | 4 |
| 5/22/97 | 10 | 5/1997 | 6 |
| 8/8/97 | 10 | 8/1997 | 1 |
| 11/5/97 | 10 | 11/1997 | 1 |
| 2/17/98 | 10 | 2/1998 | 0 |
| 5/22/98 | 10 | 5/1998 | 1 |
| 8/25/98 | 10 | 8/1998 | 3 |
| 11/20/98 | 10 | 11/1998 | 3 |
| 2/22/99 | 10 | 2/1999 | 2 |
| 5/20/99 | 10 | 5/1999 | 3 |

| 8/25/99 | 10 | 8/1999 | 2 |
| 11/18/99 | 10 | 11/1999 | 2 |
| 2/21/00 | 10 | 2/2000 | 2 |
| 5/9/00 | 10 | 5/2000 | 0 |

The trial court also highlighted the testimony of Blanchard, Mr. Broadway, and Thornton, who lived near the FL1 Well and were able to testify regarding visitors to the well site, access to the site, and the overgrown state of the site. The court noted Mr. Broadway's testimony regarding the Cottonbelt well, operated by Jeems, and how the people checking that well over the years repeatedly left the gate open allowing cattle to get out. The court said:

> Defendants would have the court believe that for approximately 15 years the pumper(s) parked in the midst of the 269-acre subject tract, hopped at least one fence, walked through a cow pasture to change the chart on the [FL1] Well, and then walked all the way back to the truck. Further, said pumper(s) did all of this hopping and walking year-round in all weather conditions for 15 years and was never seen by Blanchard, Broadway, or Thornton.

The trial court called the defendants' theory unreasonable and illogical. The court found that the Lassett Servitude was extinguished due to nonuse prior to the spudding of the Robertson well. On April 13, 2022, the trial court signed a judgment stating that the FL1 Well ceased producing minerals by or before May 1999 and that the Lassett Servitude terminated and was extinguished prior to the spudding of the Robertson well on July 15, 2009.

On May 2, 2022, the Lassetts filed a motion for a new trial stating that while working on an unrelated case, they discovered that Jeems paid Gardner Consultants, Inc. ("Gardner") for meter-chart reading for the "Carmel Area Wells," which included the FL1 Well, and was doing so in May 1999. The Lassetts stated that the meter reading could be explained as

21

a larger conspiracy to misrepresent production by paying for the records. Alternatively, defendants stated that the charts were read and interpreted by Gardner, an independent third party, and its information was consistent with the COC production and disposition reports.

The Lassets also stated that Gardner charged Jeems $81.40/month for gas chart "integration" for the 10 Carmel Area Wells, much less than the $300/month figure provided by Orf. The Lassetts argued that the low cost made it potentially profitable for Jeems to continue producing the FL1 Well. Plaintiffs opposed the motion for a new trial.

The trial court granted the motion for a new trial, and on February 2, 2023, the trial court heard testimony regarding the newly discovered information. Marilyn Wells ("Ms. Wells"), an employee at Jeems since 1977, testified about a "Joint Interest Billing" file which included invoices from Gardner to Jeems from November 1999 to October 2000 and a list of Carmel Area Wells. Ms. Wells testified that the list of wells was generated by Jeems and came in two separate forms, one typewritten and one handwritten. Ms. Wells stated that the invoices did not identify a specific well or provide production for a specific well. The invoices included charges for chart integration and supplies. Ms. Wells stated that it was possible for a chart to be integrated with zero production. Ms. Wells stated that the list of wells appeared to be reused or copied from one month to the next. Ms. Wells stated that she never went into the field when working for Jeems and she did not direct the day-to-day activities of the accounts payable clerks at Jeems.

On May 22, 2023, the trial court issued its reasons for judgment for the new trial. The court noted that defendants did not call the pumper or a

Gardner employee to testify regarding the Gardner invoices or activity on the subject property. The court said that the Gardner invoices did not overcome the evidence admitted during the original trial or provide evidence of production from the FL1 Well. The court said the Lassett servitude was extinguished due to nonuse by or before May 1999, ten years before the spudding of the Robertson well in July 2009. On July 7, 2023, the trial court signed a judgment stating that the new evidence presented by defendants did not provide proof of production from the FL1 Well. The trial court maintained its April 13, 2022, judgment. The Lassetts now appeal.

**DISCUSSION**

*Review of Defendants' Motion for Summary Judgment*

In their first assignment of error, appellants argue that the trial court erred in relying upon one of Sutton's affidavits in ruling on their motion for summary judgment and all three of his affidavits in rendering its judgment at trial. Appellants argue that, after removing the Sutton affidavits from the relevant facts, the plaintiffs failed to meet their burden on summary judgment and plaintiffs' claims should have been dismissed.

However, questioning of the trial court's denial of its motion for summary judgment is "procedurally misplaced." *Pamplin v. Bossier Par. Cmty. Coll.*, 38,533, p. 4 (La. App. 2 Cir. 7/14/04), 878 So. 2d 889, 892, *writ denied*, 04-2310 (La. 1/14/05), 889 So. 2d 266. In *Pamplin v. Bossier Par. Cmty. Coll., supra*, this court did not review the denial of the defendant's motion for summary judgment, but rather reviewed the trial judgment. This court stated:

> In *Hopkins v. American Cyanamid Co.,* 95-1088 (La. 1/16/96), 666 So. 2d 615, our Supreme Court instructed that appellate review of a trial court's denial of a motion for summary

23

judgment is foreclosed after a full trial on the merits. The court stated:

> The court of appeal decided this issue, not based upon the record, but upon the pleadings and evidence presented in support of the pre-trial motion for summary judgment. This was erroneous for the following reason: once a case is fully tried, the affidavits and other limited evidence presented with a motion for summary judgment—later denied by the district court—are of little or no value. Appellate courts should not rule on appeal after a full merits trial on the strength alone of affidavits in support of a motion for summary judgment that was not sustained in the district court. In such cases, appellate courts should review the entire record.

*Id.* at 624. Accordingly, in view of this ruling, while the issues of the State's duty and notice are properly before us by the appellant's argument, the evidence presented at the time of the pre-trial interlocutory ruling and the *de novo* standard of review for summary judgments are no longer pertinent. We will consider the issues raised in the State's argument in view of the evidence presented at trial under the manifest error standard of review.

*Pamplin v. Bossier Par. Cmty. Coll.*, *supra* at p. 4-5, 878 So. 2d at 892.

Appellants' motion for summary judgment was denied by the trial court and a full trial on the merits followed. Consequently, appellate review of the trial court's denial of defendants' motion for summary judgment is foreclosed. This court will consider the issues raised in appellants' argument, assessing the evidence offered at trial under the manifest error standard of review. Accordingly, this court will consider only whether the Sutton affidavits were admissible at trial.

*The Sutton Affidavits*

La C.E. art. 801(D)(2) says that a statement is not hearsay if:

The statement is offered against a party and is:

(a) His own statement, in either his individual or a representative capacity;

(b) A statement of which he has manifested his adoption or belief in its truth; or

(c) A statement by a person authorized by him to make a statement concerning the subject.

Here, Sutton's affidavits were offered against the Lassetts and he testified that he would not have signed the affidavits if they were not correct at the time he signed them. Appellants cite to a Fourth Circuit case, *McKeogh v. Healthcare Indem., Inc.*, 17-1006 (La. App. 4 Cir. 7/11/18), 250 So. 3d 1064, to support their assertion that Sutton's affidavits could not be used against the Lassetts because they were both defendants in the case.

In *McKeogh v. Healthcare Indem., Inc., supra*, the plaintiff offered an affidavit in opposition to the defendant-doctor's motion for summary judgment. In the affidavit, she alleged a statement made by a physical therapist-defendant who was a party to the suit, but not a party to the motion for summary judgment. The appellate court found the hearsay exception found in La. C.E. art. 801(D) for a statement offered against a party inapplicable because the hearsay statement was the physical therapist-defendant's and not the doctor-defendant's statement and the physical therapist was not a party to the motion for summary judgment.

We do not find *McKeogh v. Healthcare Indem., Inc., supra*, instructive in this matter. As discussed, review of the trial court's ruling on the motion for summary judgment is foreclosed. This court is examining the trial court's rulings following the trial and new trial. Sutton, in his affidavits, did not refer to statements made by another, but instead made his own statements as president and a representative of Jeems, which was a party to the litigation after the Lassetts filed a third-party demand against the

25

company.  The Sutton affidavits were not hearsay as they were offered by a party against another party.

Furthermore, La. C.E. art. 804(A)(3) provides that a declarant is unavailable as a witness when the declarant cannot or will not appear in court and testify to the substance of his statement made outside of court, which includes situations in which the declarant testifies to a lack of memory of the subject matter of his statement.  La. C.E. art. 804(B)(3) provides an exception to the hearsay rule for when a declarant is unavailable as a witness and his statement, which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability, or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true.

Sutton stated that he had no memory of the facts in his affidavit, making him unavailable as a witness.  What Sutton stated in his affidavits, concerning what Jeems reported to the COC about the well production for the FL1 well, that the figures were "inaccurate" or "not true," was a statement against interest.  Jeems subjected itself to liability in making that statement about erroneous SONRIS reporting.  We find that the trial court did not err in finding that Sutton's affidavits were admissible.

*Prescription of Nonuse of the Lassett Servitude*

In their second assignment of error, appellants state that, after removing the Sutton affidavits from the relevant facts, the plaintiffs failed to meet their burden at trial of disproving defendants' *prima facie* showing that there was use of the mineral servitude through the reported production of natural gas made by Jeems to the COC.

26

Appellants refer to the evidence that plaintiffs provided at summary judgment and trial as "negative evidence." They state that their "positive evidence," the SONRIS records showing production of natural gas from the FL1 Well until at least 2000, is superior to defendants' negative evidence, which consisted of testimony and trial exhibits offered to show the condition of the FL1 Well site and prove that no one witnessed an operator accessing the site. Appellants ask that the trial court's judgments be reversed.

Appellees contend that the evidence elicited at trial from Ganey, Broadway, and Thornton was strong enough to overcome defendants' evidence, which only consisted of the FL1 Well production records from the COC. Appellees state that Ganey's testimony showed that there was no *quid pro quo* deal between Jeems and him to concoct an affidavit that was not based on personal knowledge, and their expert witnesses showed that the production reported to the COC was inaccurate and that the FL1 Well site was inaccessible and overgrown.

Appellees state that the COC/SONRIS records defendants relied on at trial contained inconsistencies which brought their accuracy into question. Appellees argue that the evidence presented at the new trial, the Gardner invoices, did not mention the FL1 Well, which was only mentioned in notes attached to the invoices. Appellees ask this court to affirm the trial court's judgments.

A mineral servitude is the right of enjoyment of land belonging to another for the purpose of exploring for and producing minerals and reducing them to possession and ownership. La. R.S. 31:21. A mineral servitude is extinguished by prescription resulting from nonuse for 10 years. La. R.S. 31:27. Prescription of nonuse is interrupted by the production of

any mineral covered by the act creating the servitude. Prescription commences anew from the date of the cessation of actual production. La. R.S. 31:36. To interrupt prescription it is not necessary that minerals be produced in paying quantities. It is necessary only that minerals actually be produced in good faith with the intent of saving or otherwise using them for some beneficial purpose. La. R.S. 31:38.

When the prescription of nonuse is pleaded, the owner of the dominant estate has the burden of proving that he or some other person has made use of the servitude as appertaining to his estate during the period of time required for the accrual of the prescription. La. C.C. art. 764. This burden of proof has been applied even when a surface owner sues to obtain the cancellation of a mineral servitude. *Smith v. Andrews*, 51,186 (La. App. 2 Cir. 2/15/17), 215 So. 3d 868, *writ denied*, 17-0468 (La. 5/19/17), 220 So. 3d 749.

We find that the trial court did not err in finding that the Lassett Servitude had prescribed following 10 years of nonuse. The evidence offered at trial consisted of much more than the testimony provided by Sutton and his affidavits and the testimony of Smith.

Appellants argue that the production numbers found in the well information file was *prima facie* evidence that the FL1 Well produced gas during the relevant time period, maintaining their mineral servitude. *Prima facie* evidence is defined as evidence sufficient to establish a given fact which, if not rebutted or contradicted, will remain sufficient. *Livingston Par. Sch. Bd. ex rel. Sales & Use Tax Div. v. Hwy 43 Cornerstore, LLC*, 12-0103 (La. App. 1 Cir. 5/23/12), 93 So. 3d 709. Once the Lassetts showed,

through the SONRIS records, that the FL1 Well was producing, the burden shifted to plaintiffs to contradict that evidence, which they successfully did.

Ganey testified he never saw anyone access the FL1 Well site, he described the overgrown condition of the site, and said that it was fully enclosed with a fence containing locked gates. He had to unlock a gate for anyone to access the well. Ganey said he discussed the leaking compressor with Smith and told him that something seemed off about the reported production for the FL1 Well. Ganey acknowledged the communication between himself and Smith about the release related to the damage caused by the leaking compressor.

Mr. Broadway testified about never seeing anyone accessing the FL1 Well site or seeing well-related activity, how the entirety of the Property was fenced in, and how overgrown the well site was. Mr. Broadway stated that an unrelated well located on the Property was accessed three times a week and that the pumpers who maintained that well constantly left the gate open, which allowed his cattle out onto the highway. During his ownership of the Property from 1992 to 2016, no one asked his permission to access the FL1 Well and there was no means of easily accessing the well site.

Blanchard testified that he could see the FL1 Well from his property and he initially saw pumpers access the well a couple of times a week when he purchased his land in 1981. A couple of years later, he stopped seeing that activity at the site. Thereafter, his neighbors put up a fence cutting off the access road to the well entirely. Blanchard planted hedges along the fence, further impeding any access to the well site. Blanchard said a fence was placed around the Property in the late 1990s.

29

Thornton similarly testified that he lived adjacent to the Property from 1981 to 1994 or 1995, and he did not see anyone accessing the FL1 Well site. He compared the lack of activity at the FL1 Well with that at the Cottonbelt well, which he could see from his home. He said there was a lot of action, people, and equipment at the Cottonbelt well and he never saw the same at the FL1 Well. Thornton said that the FL1 Well itself had trees growing through it, but the area around the well was mowed.

Appellants characterize the trial evidence consisting of the testimony from Ganey, Mr. Broadway, Thornton, and Blanchard as "negative evidence," which they claim, without Sutton's affidavits, was insufficient to overcome the "positive evidence" they provided, which consisted solely of the well production reported to the COC by Jeems. However, appellants' argument fails to consider that plaintiffs offered more than just the testimony of those four men.

Orf testified as an expert in natural gas measurement and explained that fluid build-up, the orifice plate and bore sizes, bleeding lines, and humidity could affect a well's readings, possibly showing production when there was none. He said that a well orifice chart of less than one MCF per month could not be interpreted and that the lowest possible production that could be read and reported for the FL1 Well, given the well's orifice plate and bore size, would have been 2 ½ MCF, which would have required that the production for the month happened within a few hours.

Henry testified that the COC audited monthly oil and gas production and disposition reports for discrepancies to ensure they matched each other, but it did not verify that any one well's production was accurately reported

30

to the COC. Henry said that the R5D reports showed only how much gas was produced in a particular field, not a particular well.

One argument the Lassetts made to the trial court was that the well production found in the R5T and R5D reports matched, proving that the records were accurate. Plaintiffs provided the R5T reports filed by Jeems for the Red River Bull Bayou field, which listed several wells, including the FL1 Well, for March 1999 and May 1999. The gas production for each well was listed in the R5T reports, with all the gas produced in that field totaled at the bottom. Plaintiffs also provided the R5D reports Jeems filed with the COC for the same field and the same months. Those reports listed Jeems as the operator and the field as the Red River Bull Bayou field, but the amount produced by each well was not itemized. Rather, the total volume of gas produced from that field was provided, which matched the total from the R5T reports. So, there was no way of matching the production for each individual well listed in the R5T reports with the R5D reports for the corresponding months.

Raley testified that the DT-1 test showed what a particular well produced in a 24-hour period and that usually the gas produced during the DT-1 tests was metered and sold. The operator, here, Jeems, performed the tests. Raley said that the amount of gas produced during the DT-1 tests could be multiplied by 30 to get the amount of gas a well produced in one month's time.

The SONRIS well information file for the FL1 Well shows that from 1994 to 2006, the well produced exactly 10 MCF each time a DT-1 test was performed. Therefore, the FL1 Well should have produced approximately 300 MCF/month for those years, according to Raley's testimony. Starting in

31

March of 1996, the FL1 Well produced less than 10 MCF each month. It is difficult to believe that Jeems performed a DT-1 test but did not capture and sell the gas produced during those tests, which it was required to report on the R5T reports. Peel noted the differences between the DT-1 test results and the well production for the same months. He also observed that similar wells in the same reservoir as the FL1 Well saw a sharp decline in gas production within a few years of the wells being spud, just like the FL1 Well.

Smith testified about examining the FL1 Well's production on the SONRIS site. Smith initially had trouble remembering details about letters he signed and whether he prepared Sutton's affidavits. As the trial court noted, he later remembered facts he had said before he could not remember. The trial court found that Smith lacked candor in his testimony. This court affords the trial court great deference when assessing the credibility of any witness. *State v. Johnson*, 54,028 (La. App. 2 Cir. 9/22/21), 328 So. 3d 524, *writ denied*, 21-01850 (La. 2/22/22), 333 So. 3d 441.

Dr. Castille testified about the state of the FL1 Well site over a period of years using aerial photographs. The photographs are telling. A distinct difference can be seen between the photograph depicting the well site in 1982 and the later photos of the site. In 1982, the well site was cleared and a visible vehicle path to the well can be seen. Each successive photograph depicts the well site as more and more overgrown. The road where a four-wheel vehicle would access the well was no longer visible by 1988 and the site contained vegetation. It also shows single track marks, like those a motorcycle would make. The 1994 photo depicts the fence line Blanchard mentioned in his testimony which cut off vehicle access to the FL1 Well.

32

The 1998 and 2004 photographs show the hedges that Blanchard planted, further impeding access to the well site, and even more vegetation and larger trees growing at the well site.

As Dr. Castille described, the 2012 photo shows that the FL1 Well was partially cleared after it was plugged in 2011. Dr. Castille provided comparative photographs depicting an active well site starting in 1994 and ending in 2020. The area around the active well was clear of vegetation, the well, tank, and tank batteries are clearly visible, and the access road to the well can clearly be seen in the photographs.

Fitzgerald stated that there were "possibly" errors in the FL1 Well information file and the DT-1 test results but disagreed that the monthly production numbers for the well could have been in error. Her testimony appeared to conflict with her previous deposition testimony in which she said the production for the FL1 Well for April 2000 could have been the actual production of a different well. Fitzgerald testified that she would rely on the COC report, even knowing some of data included in SONRIS well information file was inaccurate, when advising a client about whether to purchase a well. The trial court found that part of Fitzgerald's testimony "incredulous," that she testified as an interested party, and that her expert opinion was unreliable, affording her testimony no weight. We agree.

We find the trial court's reasoning persuasive here. Photographs of the FL1 Well site show that it progressively became more inaccessible and overgrown with vegetation once there was a decline in production from the well in the 1980s. A fence and hedge row were placed which blocked access to the well by vehicle and foot. The data from the FL1 Well information file found on SONRIS is self-contradictory, and there was no third-party

33

verification that the information reported about testing and production for the well was accurate. The DT-1 test results should not have been more than what the well produced in the corresponding month. There was consistent testimony about no one accessing the well starting in the 1980s and through the 1990s.

We also find that the evidence the Lassetts produced at the new trial unpersuasive that Jeems continued to produce the FL1 Well. The billing file did not include information about specific wells and Ms. Wells testified that a well chart could have been integrated with zero production. The trial court correctly determined that the Gardner invoices supplied by Jeems were insufficient to overcome the evidence produced by plaintiffs at trial showing a lack of activity and production at the FL1 well site.

The trial court pointed out the unreasonable nature of defendants' theory that in order for a pumper to access the FL1 Well for 15 years, he could have travelled to the well by foot from the road, which included hopping a fence and navigating an overgrown pasture. We likewise find that theory nonsensical. This assignment of error has no merit, and the trial court's rulings are affirmed.

## CONCLUSION

The trial court's rulings are affirmed. The costs of the appeal are assessed to appellant.

**AFFIRMED.**